608 A.2d 515

**Richard PRIMAVERA and Joan Primavera, H/W**

**v.**

**The CELOTEX CORPORATION, Eagle–Picher Industries, GAF Corporation, Owens–Corning Fiberglas Corp., Pittsburgh Corning Corporation, H.K. Porter Corporation, Raymark Industries, Appellants.**

Superior Court of Pennsylvania.

Argued Oct. 22, 1991.

Filed May 7, 1992.

Reargument Denied July 2, 1992.

42

Kimberly Waldron, Westmont, N.J., Harriet Wall, Philadelphia, for appellants.

Suzanne Reilly, Philadelphia, for appellee.

Before DEL SOLE, BECK and HUDOCK, JJ.

BECK, Judge:

The primary issue in this case is the extent to which an expert witness may rely on information generated by other professionals who are not subject to cross examination.

In this suit for recovery for asbestos related harm defendant objects to the admission of certain expert testimony in which the expert relied on data from reports which, although admitted into evidence, were generated by professionals who were not subject to cross-examination. We find the trial court did not err in admitting this testimony.

Appellee Richard Primavera instituted an action for personal injuries against various manufacturers of asbestos products for injuries allegedly sustained during his employment at New York Shipbuilding and Drydock Company (New York Ship) and at the Philadelphia Naval Yard.[1] Primavera claimed that the injuries resulted from workplace exposure to asbestos.[2] After a trial which first determined damages and thereafter assigned liability, the jury returned a verdict in favor of Primavera for $1,500,000. At the liability phase of the trial, present appellant, GAF Corporation, was assigned 20% of the liability for Primavera's injuries. The parties filed post-trial motions. Thereafter, the trial court granted a remittitur and reduced the jury's verdict to $500,000 for Primavera. The trial court also awarded delay damages from October 15, 1982 to November 16, 1988, which totalled in excess of $336,000 for Primavera. Other requests for relief were denied. GAF appeals.

On appeal appellant asserts that the trial court erred in admitting the testimony of four expert medical witnesses or plaintiff which was based on conclusions derived from their own examination and also from medical reports prepared by doctors who did not testify and were not available for cross-examination. Appellant contends that the trial court further compounded this error by permitting the reports from non-testifying specialists to be sent out with the jury during its deliberations. After careful examination of the record and the relevant case law, we conclude that the experts' testimony did not exceed the bounds of permissible testimony. Further, we find no other cause for reversal in appellant's additional challenges. Appellant is not

1. Plaintiff Joan Primavera, appellee Richard's wife, sued for loss of consortium due to her husband's medical condition. The jury awarded Joan Primavera $10,000 in damages which was later remitted by the trial court to $5,000.

2. Appellee Primavera attempted to prove that both his colon cancer and lung disease were caused by occupational exposure to asbestos. However, the trial court granted defendants' motion for a non-suit on the colon cancer issue, thus removing that issue from the jury's consideration.

entitled to a new trial. However, appellant makes the additional claim that it was denied oral argument on the issue of delay damages and deprived of any opportunity to present evidence on that issue. Since appellant sought to argue his motion to bar delay damages and since the trial court gave no reason denying the request, we remand for the limited purpose of permitting appellant to present oral argument and such testimony as the trial court deems appropriate on the issue of delay damages only.[3]

Factually, the instant case can be summarized as follows. From 1959 through 1964, Richard Primavera worked at New York Ship. He was employed as a painter both inside and outside of vessels. He painted pipes covered with asbestos insulation and also worked in the vicinity of workers who used asbestos products in a variety of ways. At New York Ship, Primavera wore no protective equipment.

Between 1964 and 1978, Primavera obtained employment as a painter in a variety of jobs. The degree to which he was exposed to asbestos in those workplaces is unascertained. However, in 1978 Primavera went to work at the Naval Shipyard in Philadelphia. Between 1978 and 1981, Primavera worked on vessels and was exposed to asbestos materials but wore a respirator and a mask. In January 1981, Primavera had a series of chest X-rays taken as part of an asbestos screening program undertaken by the shipyard. The "abnormal" results were reported to Primavera's physician, Dr. Langanella.

Primavera was referred to Dr. Joseph Sokolowski, a pulmonary disease specialist, who examined him for evidence of asbestos related illnesses. In 1981, Primavera was diagnosed as having colon cancer and underwent an operation to remove part of his colon. Primavera went back to work at the shipyard. However, he ceased working on vessels. He continued to be monitored by Dr. Sokolowski. The complaint in the instant case was filed in December, 1981.

3. The trial court did not address the issue of delay damages in its otherwise complete and lengthy opinion.

In 1986, Primavera complained of chest pain and as a result, Dr. Sokolowski ordered X-rays and a CAT scan. Primavera also had a bronchoscopy and thoracotomy in order to biopsy his lung tissue and determine whether he had lung cancer. He was referred to Deborah Heart and Lung Center for the latter surgery and at Deborah he was attended by Dr. Strong, a thoracic surgeon, Dr. Steiner, a radiologist and Dr. Feierstein, a pulmonary specialist. No cancer of the lung was detected at that time.

In 1986, an analysis of the lung tissue was performed by pathologist Dr. C. Ivan Gordon, who initially detected "usual interstitial pneumonitis" and then, later, having treated the tissue with blue dye and located asbestos particles, also diagnosed asbestosis.

At trial the pulmonary disease specialist Dr. Sokolowski, pathologists, Drs. Gordon and Harrer, and oncologist Dr. Stoloff testified on behalf of plaintiff. Each of the testifying medical specialists had either personally examined Primavera or had personally examined the slides of biopsied tissue or both.

The doctors' testimony was based on each doctor's own assessment of the medical data gathered on Primavera, as well as on findings submitted by other professionals. In their testimony the physicians also referred to and incorporated into their conclusions reports, findings and opinions of other specialists. In particular, the testifying doctors utilized the findings and observations of three specialists who did not testify and, therefore, were not available for cross-examination. The non-testifying doctors were: Dr. Robert Steiner, a radiologist; Dr. Michael Strong, a surgeon; and Dr. Mervyn Feierstein, a pulmonologist. Dr. Steiner reviewed chest X-rays and submitted a radiology report describing his findings to the other physicians. Dr. Strong reported his surgical findings. Dr. Feierstein was the attending pulmonologist who was consulted at Deborah Heart and Lung Center when Primavera's lung was biopsied. In this capacity, Dr. Feierstein prepared a summary for the hospital records which described Primavera's medical histo-

ry, physical examination, chest X-ray and the results of the exploratory surgery.

Appellant, GAF Corporation, complains that the references to the reports and findings of the non-testifying doctors, Steiner, Strong and Feierstein, were examples of inadmissible hearsay which require this court to grant appellant a new trial.

■ Appellant's argument fails on several grounds. First, the core testimony from Primavera's testifying experts was based on personal observation and first-hand analysis of the medical evidence. The references made to the reports of other doctors were slight and formed only a minor portion of the data relied on by the testifying experts to form their in-court conclusions. Moreover, as the following discussion will elaborate, there is a well-settled exception to the hearsay rule which permits experts to testify regarding reports of others which are not in evidence, but upon which they relied in reaching their professional conclusions. The complained-of testimony fell well within this established exception and thus was admissible.

■ It is well understood that medical experts are permitted to express opinions which are based, in part, upon reports which are not in evidence, but which are customarily relied upon by experts in the practice of the profession.[4] This exception to the rule against hearsay was adopted in Pennsylvania law in 1971 in *Commonwealth v. Thomas*, 444 Pa. 436, 445, 282 A.2d 693, 698 (1971) and has been

**4.** While the most "widely recognized application" of the exception is in cases such as the instant one where medical experts are involved, the rule has been applied elsewhere as well. *In re Glosser Bros., Inc.,* 382 Pa.Super. 177, 199, 555 A.2d 129, 140 (1989) (expert permitted to testify as to the value of certain assets based on an appraisal performed at the company's request, even though the appraisal was not in evidence, because appraisal was type of source expert would rely on in forming his opinion); *Kearns by Kearns v. DeHaas,* 377 Pa.Super. 200, 207–211, 546 A.2d 1226, 1230–1231 (1988), *appeal denied,* 522 Pa. 584, 559 A.2d 527 (1989) (vocational expert relied on various medical, psychological and psychiatric reports in forming his opinion about the minor plaintiff's future employment prospects; reports on which expert relied were of a type upon which a vocational expert would normally rely).

applied consistently since then. *See Cooper v. Burns,* 376 Pa.Super. 276, 286, 545 A.2d 935, 940 (1988), *appeal denied,* 522 Pa. 619, 563 A.2d 888, and cases cited therein. *See also Commonwealth v. Trill,* 374 Pa.Super. 549, 563, 543 A.2d 1106, 1113 (1988); *In re Preteroti,* 124 Pa.Cmwlth. 540, 541, 556 A.2d 540, 541 (1989). The *Thomas* case involved a challenge to the testimony of a Commonwealth psychiatrist who was asked to give an opinion on the sanity of the defendant. As background for his findings and opinions, the psychiatrist was permitted to refer to tests and test scores given by a non-testifying psychologist, as well as all the reports of numerous psychological tests and interviews done by other mental health professionals. The sum of these reports, in addition to personal interviews conducted by the testifying psychiatrist, were taken into account when the doctor concluded that the defendant was not insane at the time of the killing. Thus, it was in the context of this case that our supreme court was prompted to adopt as the law in Pennsylvania the rule which permits an expert witness to rely on, and disclose, data which is not in evidence in order to form his expert opinions, assuming the materials relied on are of the type reasonably relied on by experts in their respective fields. *Thomas, supra,* 444 Pa. at 444–445, 282 A.2d at 698–699.

In *Cooper v. Burns, supra,* a physician testifying for the plaintiff stated that he relied upon a diagnosis by another expert, a psychiatrist, that the plaintiff was suffering from a major depression. The testifying physician indicated that he used the non-testifying psychiatrist's diagnosis in treating the plaintiff and in deciding to postpone surgery. The *Cooper* court found the reference to the psychiatrist's diagnosis "within the *Thomas* exception" which allows experts to rely on the reports of others. 376 Pa.Super. at 286, 545 A.2d at 940.

Likewise, in *Christy v. Darr,* 78 Pa.Cmwlth. 354, 357–361, 467 A.2d 1362, 1364–1365 (1983), a neurosurgeon testified about the plaintiff's double vision and loss of hearing based upon other experts' reports which were neither in

evidence nor subject to cross-examination. Based on the findings contained in the reports by other physicians, the neurosurgeon was permitted to express an opinion that the plaintiff's auditory and opthomological problems were caused by the trauma plaintiff experienced at the hands of the defendant. The neurosurgeon noted in his testimony that the plaintiff's auditory and opthomological conditions, all of which were described by other experts, were items which must be taken into account in deciding what course of treatment is warranted. Thus, the court found that "these reports are the type a neurosurgeon would routinely encounter in his practice" and were admissible under the *Thomas* rule. 78 Pa.Cmwlth. at 360, 467 A.2d at 1365.

The logical underpinnings for this rule which allows the qualified expert to rely on material which might otherwise be classified as hearsay are multi-fold. First, the rule is born of practical necessity. An expert's opinion may be based upon years of professional experience, schooling and knowledge, not all of which can be presented on a first-hand basis in court. Moreover, and more importantly in the context of this case, the expert is assumed to have the mastery to evaluate the trustworthiness of the data upon which he or she relies, both because the expert has demonstrated his expert qualifications and because the expert regularly relies on and uses similar data in the practice of his or her profession. The kind of data contemplated by the rule is often, as it is in this case, the kind of data used daily by experts in making judgments, reaching diagnoses, and taking action.

This rationale is particularly apt in cases such as the instant one, involving the sources of physicians' opinions and conclusions regarding a patient's health. The practice in court literally reflects the process upon which expert opinion is based in the field. For example, the Advisory Committee's Note to Federal Rule of Evidence 703,[5] which

5. Rule 703 of the Federal Rules of Evidence provides as follows: The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known

like the state rule derived from *Thomas* permits experts to rely on out-of-court data in expressing their opinions, explains:

> [A] physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety including **statements** by patients and relatives, **reports** and **opinions** from nurses, technicians and other doctors, hospital records, and X-rays. Most of them are admissible in evidence, but only with the expenditure of substantial time in producing and examining various authenticating witnesses. The physician makes life-and-death decisions in reliance upon them. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes.

(emphasis added).

The fact that experts reasonably and regularly rely on this type of information merely to practice their profession lends strong indicia of reliability to source material, when it is presented through a qualified expert's eyes.

Our courts have described this rule as "wise and salutary" [6] and have remarked on the tendency to "liberalize ... the permissible underpinnings of expert testimony".[7] In further explaining the rationale of the Federal Rule of Evidence 703, one federal court emphasized that the rule reflects the reality of expert analysis and decision-making:

> The rationale ... is that the expert, because of his professional knowledge and ability, is competent to judge for himself the reliability of the records and statements on which he bases his expert opinion. Moreover, the

> to [the expert] at or before the hearing. If of the type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

6. *Commonwealth v. Thomas, supra,* 444 Pa. at 445, 282 A.2d at 699.

7. *In re Glosser, Bros., Inc., supra,* 382 Pa.Super. at 199, 555 A.2d at 140. *See also Bolus v. United Penn Bank,* 363 Pa.Super. 247, 270, 525 A.2d 1215, 1227 (1987) ("Following the guidance of the federal rules of evidence, our courts have liberalized the permissible bases for an alleged expert's opinion testimony".)

opinion of expert witnesses must invariably rest, at least in part, upon sources that can never be proven in court. An expert's opinion is derived not only from records and data, but from education and a lifetime of experience. Thus, when the expert witness has consulted numerous sources, and uses that information, together with his own professional knowledge and experience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as hearsay in disguise.

*United States v. Williams*, 447 F.2d 1285, 1290 (5th Cir. 1971), *cert. denied* 405 U.S. 954, 92 S.Ct. 1168, 31 L.Ed.2d 231 (1972), *rehearing denied* 405 U.S. 1048, 92 S.Ct. 1308, 31 L.Ed.2d 591 (1972).

In noting the necessity and value of permitting experts to rely on extrajudicial reports and sources, it is important to stress that it is actually the testifying expert's opinion which is being presented and which is subject to scrutiny, cross-examination and credibility determinations. Hence, it is often the case, as it was here, that experts are questioned concerning whether relied-upon sources are "authoritative" or generally accepted, whether the source material is truly the type ordinarily relied on by similar experts, whether independent or further judgment was brought to bear on particular source material and whether the expert is competent enough to judge the reliability of the sources upon which he relied. These are the safeguards which assure that the experts' opinions are not being offered based on inherently untrustworthy data or data which is not commonly used by other professionals. If an expert has made faulty assumptions or leaps of judgment in relying on certain sources or in forming conclusions based on those sources, these issues are the proper subject of cross-examination.

The relative roles of jury and expert in this context have been described as follows:

In a sense, the expert synthesizes the primary source material—be it hearsay or not—into properly admissible evidence in opinion form. The trier of fact is then capa-

ble of judging the credibility of the witness as it would that of anyone else giving expert testimony. This rule respects the functions and abilities of both the expert witness and the trier of fact, while assuring that the requirement of witness confrontation is fulfilled.

*United States v. Sims*, 514 F.2d 147, 149 (9th Cir.1975), *cert. denied* 423 U.S. 845, 96 S.Ct. 83, 46 L.Ed.2d 66 (1975).

As this court has indicated, the crucial point is that the fact-finder be made aware of the bases for the expert's ultimate conclusions, including his partial reliance on indirect sources. "The adverse party then has the opportunity ... to present its own countervailing facts and figures and/or expert testimony to convince the factfinder that the weight to be given to the other side's expert testimony should be little or none". *In re Glosser Bros., Inc.*, 382 Pa.Super. 177, 202, 555 A.2d 129, 142 (1989).

██ The above analysis depends, of course, on the expert actually acting as an expert and not as a mere conduit or transmitter of the content of an extrajudicial source. An "expert" should not be permitted simply to repeat another's opinion or data without bringing to bear on it his own expertise and judgment. Obviously in such a situation, the non-testifying expert is not on the witness stand and truly is unavailable for cross-examination.[8] The applicability of the rule permitting experts to express opinions relying on extrajudicial data depends on the circumstances of the particular case and demands the exercise, like the admission of all expert testimony, of the sound discretion of the trial court. Where, as here, the expert uses several sources to arrive at his or her opinion, and has noted the reasonable and ordinary reliance on similar sources by experts in the field, and has coupled this reliance with personal observa-

8. In elucidating this concept in the context of the federal rules of evidence, one court noted:
> Rule 703 does not sanction the simple transmission of hearsay; it only permits an expert opinion based on hearsay.
> *United States v. Tomasian*, 784 F.2d 782, 786 (7th Cir.1986).

tion, knowledge and experience, we conclude that the expert's testimony should be permitted.

■ This analysis accurately describes what transpired in the instant case. Thus, Dr. Sokolowski, the pulmonary disease specialist, testified that when he began treating Primavera in 1981, he reviewed X-rays which had been taken of the patient between 1977 and 1981. As a result of these x-rays, as well as personal examination and occupational and health history, he reached a conclusion that Primavera underwent "pleural changes consistent with the diagnosis of pleural asbestosis". Dr. Sokolowski reported the physical findings revealed in the X-rays which led him to this conclusion. In addition, Dr. Sokolowski explained that, in his pulmonology practice, he frequently relies on CAT scans and X-rays to diagnose and treat cancer. A second set of CAT scans ordered in 1986 led Dr. Sokolowski to conclude that Primavera had pleural thickening that was asbestos-related. He was also concerned that lesions he observed were lung cancer. Dr. Sokolowski referred Primavera to Deborah Heart and Lung Center for further evaluative surgery.

Dr. Sokolowski also testified that he received the reports from the specialists at Deborah Heart and Lung Center and that he ordinarily relies on such reports to design a course of treatment in his practice as a pulmonologist. As a result, Dr. Sokolowski was permitted in his testimony to refer to the findings of another pulmonary specialist, Dr. Feierstein, findings which were "nodule left lower lobe, etiology to be determined; asbestos related pleural disease". Again, Dr. Sokolowski noted that, as Primavera's main treating physician, he relied, in part, on Feierstein's findings.

It is important to note that when Dr. Sokolowski sent Primavera to Deborah Heart and Lung Center, it was to investigate the suspicion of lung cancer, which he would thereafter have to treat. Dr. Feierstein's conclusions were critical to this task although in the end they merely confirmed what Dr. Sokolowski had concluded about Prima-

vera's lung disease all along. In fact, Primavera's asbes-tos-related lung disorder, had been diagnosed by Dr. Soko-lowski in 1981, 1983, and 1984.[9] It is clear from the above description that Dr. Feierstein's report was precisely the type an expert would customarily rely upon in the practice of his profession and indeed, the fact of this reliance and the reasons for it were thoroughly explained by Dr. Soko-lowski. We conclude that Dr. Sokolowski was properly permitted to refer to Dr. Feierstein's report as one of the many bases for his medical opinions.

Dr. Stoloff, the oncologist who testified, was brought in to consult on Primavera's medical condition. In his testimo-ny he permissibly referred to the findings of other experts in reaching his opinion. For example, Dr. Stoloff testified that he reviewed the findings of Dr. Steiner, the radiologist, who interpreted Primavera's chest scans in 1986. Dr. Stein-er's physical findings noted "thickening of the fissures of the lung", "thickening of the pleura", and "interstitial dis-ease of both lungs consistent with asbestosis". In addition, Dr. Stoloff took into account the findings of the thoracic surgeon, Dr. Strong, who performed the biopsy on Primav-era. Stoloff described those findings and then testified that on the basis of "the surgical report and the pathologist's report, in addition to the x-ray report of Dr. Steiner", along with his own examination and a knowledge of the patient's medical history, he concluded that Primavera had asbesto-sis. Finally, Dr. Stoloff also referred to pulmonary special-ist Feierstein's report and findings as "one bit of evidence" in reaching his ultimate medical opinion that Primavera was suffering from asbestosis.

Dr. Harrer, one of the two pathologists who testified, interpreted the slides of Primavera's biopsied tissue. He did not directly refer to the precise findings of other ex-perts in his testimony. He did testify that in examining the tissue submitted to him, he found asbestos particles. More-

9. In 1984, Dr. Sokolowski wrote a letter on Primavera's behalf in which he identified Primavera as having a "diagnosis of pleural asbestosis" and therefore, suggested that Primavera avoid work on the ships at the naval shipyard.

over, he explained that in reviewing a case, he would use "historical events, history, physical findings of other physicians" to help him arrive at his conclusions. Dr. Harrer also explained that, while his primary function was to examine the histopathology of the tissue involved, if he were asked to make a clinical diagnosis he would also rely on reports from the pulmonologist, radiologist, etc.

Finally, Dr. Gordon, the second pathologist, who testified explained that he based his ultimate diagnosis of asbestosis on the fact that his pathological examination revealed the presence of asbestos bodies along with interstitial pneumonosis. Dr. Gordon did not rely on outside records to reach his conclusion. Instead, Dr. Gordon arrived at his "refined" conclusion when he performed a second test and stained Primavera's slides with a blue dye which allowed him to detect asbestos particles. He also noted the importance of a more accurate, precise diagnosis so as to permit the clinician to better treat the patient. Gordon further stated that the pathologist's report thus becomes a part of the patient's records, available for reference by the treating physicians. We conclude that the manner in which the testifying physicians in the instant case utilized the reports of other experts as partial support and aid in arriving at and explaining the basis for their own opinions regarding the condition of Primavera exemplified the proper use of the *Thomas* rule and was not error. In each instance in which the testifying expert referred to the out-of-court reports, the references were part of the bases upon which the experts formed their opinions.

Appellant does not suggest that the reports relied upon by the testifying doctors were not the kind of information which any physician would need to render an opinion. Nor does appellant argue that the reports themselves were inherently unreliable so as to make the experts' reliance thereon unjustifiable. Other than the general objection that the reports were hearsay, the primary thrust of appellant's challenge is that the reports contained the medical opinions or diagnoses of non-testifying doctors. Appellant argues that the inability to cross-examine the out-of-court

declarant, i.e., the doctor whose reports contributed to the testifying expert's conclusions, requires exclusion of the opinion testimony. This is not the law. In fact, citing *Thomas,* this court has stated that: "Expert opinion testimony can be founded, of course, in part, on the opinions of other experts." *Foster v. McKeesport Hospital,* 260 Pa.Super. 485, 492, 394 A.2d 1031, 1034 (1978). Moreover, in *Cooper v. Burns, supra,* 376 Pa.Super. at 286, 545 A.2d at 940, as noted above, the testifying physician was permitted to testify that he had consulted an out-of-court psychiatrist in treating the plaintiff and that he had relied upon the diagnosis that the plaintiff was suffering from a major depression.[10] We are unable to discern a distinction between a diagnosis based on sound medical evidence and an opinion based on sound medical evidence.

While the fact that the testifying expert may have based his opinion, in part, on the diagnoses and opinions of other experts may impact on the weight the jury assigns to his ultimate opinion, this fact alone does not require exclusion.[11] If the opinions expressed by other physicians are part of the

10. We note that *Cooper* also concerned another hearsay objection. The plaintiff's only expert witness was permitted to relate to the jury the diagnosis of another physician, which corroborated his diagnosis that the plaintiff had a herniated disc as a result of the accident. The *Cooper* court held that this was improper. In our view, the holding in *Cooper* regarding the second hearsay objection was an example of an expert merely transmitting hearsay data rather than actually discussing the foundation and sources for his own opinion. The testifying physician in *Cooper* simply stated that "having essentially a second opinion is always helpful" and then disclosed the opinion to corroborate his own. 376 Pa.Super. at 286, 545 A.2d at 940. Moreover, we emphasize that the admission of testimony is always subject to the additional safeguard which allows the trial court broad discretion to exclude testimony that is more prejudicial than probative. In *Cooper,* unlike in the instant case, the testifying physician was the plaintiff's only expert. The fact that he was able to corroborate his own diagnosis with an extrajudicial diagnosis of another expert whose findings did not form the basis for his in-court opinion was highly prejudicial to the defendant's case.

11. *See Cohen v. Albert Einstein Medical Center,* 405 Pa.Super. 392, 402–406, 592 A.2d 720, 725–726 (1991) (fact that expert's opinion would be based on his assessment of patient's "voluminous" medical records and not on personal observation goes to weight of testimony not its admissibility; rule of *Thomas* nevertheless applicable.).

type of material reasonably relied on by experts in the particular field, not only is disclosure of those opinions permissible, it is likely to be helpful to the jury in assisting it in evaluating the testifying expert's opinion. The intent of the *Thomas* rule is to permit expert witnesses to rely on and disclose in court the same sources which they use in the practice of their professions in order that the jury may properly assess the expert's opinion. Therefore, there is no basis in reason or case law to exclude opinions or diagnoses which are reasonably and traditionally relied upon by experts.

Along these lines, we note that in a recent case, a similar challenge was raised regarding the admissibility of an expert physician's testimony. *Smith v. Brooks,* 394 Pa.Super. 327, 575 A.2d 926 (1990) *appeal denied,* 527 Pa. 625, 592 A.2d 45 (1991). The issue was one of damages for injuries sustained in an automobile accident. In *Smith,* appellants argued that the trial court improperly admitted the expert's opinion relating to damages because it was based, in part, on the findings of other physicians. This court rejected the argument and stated:

> [W]e are satisfied that [the doctor] testified to his own observations, opinions, and conclusions based only in part on his review of the records of prior treating physicians. Moreover, he did not merely quote from or summarize the opinions of others, but used records of [the plaintiff's] prior treatment in his own examination, diagnosis, and treatment. ....
>
> [The doctor] testified, and it is not seriously disputed, that the records he relied upon were the kind that others in his profession would customarily review in connection with the examination of a patient. Moreover, he personally examined and ordered tests on [the plaintiff]; in large part his testimony was based on personal observation. There was no error in admitting his testimony.

*Smith v. Brooks,* 394 Pa.Super. at 342, 575 A.2d at 934.

Appellant's broad statement that an "out-of-court statement of medical opinion is inadmissible" is incorrect.

It is derived from and limited to a line of cases relating to the admission of hospital records as business records and is inapposite to cases relating to testimony given by an expert in court. Appellant improperly relies on cases which involve the exception to the hearsay rule which permits the admission of hospital records, as business records, to show the fact of hospitalization, treatment prescribed and symptoms given. In general, medical opinion contained in hospital records which are offered into evidence under this exception is inadmissible. *See Williams v. McClain,* 513 Pa. 300, 520 A.2d 1374 (1987); *Commonwealth v. Hemingway,* 369 Pa.Super. 112, 534 A.2d 1104 (1987); *Commonwealth v. DiGiacomo,* 463 Pa. 449, 345 A.2d 605 (1975). As the court explained in *Williams v. McClain, supra,* 513 Pa. at 305, 520 A.2d at 1376, "[t]he basic justification for the business records exception to the hearsay rule is that the purpose of keeping business records builds in a reliability which obviates the need for cross-examination." The same built-in reliability does not exist for medical opinions expressed in the hospital records. The physician whose opinion is contained in the hospital record is unavailable for cross-examination. This prohibition is in marked contrast to the expert testimony given in cases like the instant one where the expert's own tests and observations as well as those made by nontestifying specialists are subject to scrutiny through cross examination.

The law is clear and soundly based in hospital records cases. For example, the *DiGiacomo* court ruled that it was impermissible to have the custodian of the hospital records testify as to the diagnosis made by the admitting physician about the injuries by one of the assailants in the criminal case. Likewise, in *McClain,* the court ruled that the opinions of a social worker that the injuries attested to by plaintiff were psychosomatic and that the plaintiff was unstable and frustrated were inadmissible in a medical malpractice case despite the fact that these opinions were contained in a hospital report. The trial court had admitted the social worker's assessment of the plaintiff's social and

psychological problems and opinion that the problems plaintiff suffered were independent of her medical treatment under the hearsay exception pertaining to business records. As such, although the report was in evidence the social worker was unavailable for cross-examination. The report clearly was admitted to prove the truth of the matters asserted therein and to dispute the plaintiff's claim against the doctor who allegedly caused her medical problems. The *McClain* court held that the admission of the social worker's report was error.

Appellant's claim that *McClain* "resolved" or clarified an "ambiguity" in *Thomas* is wholly without basis. The *McClain* court did not cite to *Thomas* at all, nor did it suggest in any way that the *Thomas* rule was implicated. Of course, as our prior discussion makes clear, no reason existed for *McClain* to cite to *Thomas*, because the cases concern two entirely different rules of law which are founded upon unrelated rationales. In *McClain*, the disputed records were used to have the jury consider the opinion of an absent witness whose qualifications and judgment were impossible to ascertain. In contrast, in *Thomas*, as here, the disputed records were used to elucidate, in part, the bases for the opinions of in-court experts whose qualifications, judgment and reasonable reliance on the records were subject to the strict scrutiny of cross-examination. Appellant cannot rely on "hospital/business records" cases to impermissibly limit expert testimony which is based, in part, upon reasonable and reliable extrajudicial sources.

Appellant's reliance on *Lira v. Albert Einstein Medical Center*, 384 Pa.Super. 503, 559 A.2d 550 (1989), and the claim that *Lira* "resembles" the instant case is even more perplexing. In *Lira*, a medical malpractice case, the plaintiff's husband was called as a witness. In his testimony, plaintiff's husband related an incident to the jury describing an examination performed on his wife by a doctor who was not present in court and did not testify. During the course of the examination, this absent doctor was said to have exclaimed "Who's the butcher who did this!". The trial

court, later realizing its error in permitting the patently inadmissible and highly prejudicial remark into evidence, granted the defendants a new trial. The plaintiff, on appeal, claimed that the remark was admissible as an excited utterance or present sense impression exception to the hearsay rule. This court disagreed and concluded instead that the statement by the absent examining physician, which was testified to by the lay witness, was neither reflexive nor instinctive but instead was an "expression of opinion based on medical training and experience" which was not admissible under any exception to the hearsay rule. In *Lira*, the extrajudicial statement was clearly an example of an improper attempt to offer as substantive evidence the opinion of a medical expert, i.e. the opinion that the plaintiff had been "butchered", the reliability of which could not be tested at all by cross-examination. Again, *Lira* did not refer to nor limit in any way the *Thomas* line of cases, nor does it have any bearing on appellant's claim.

Unlike the above-cited cases relied upon by appellant, the *Thomas* rule was followed in a case far more analogous to the instant claim. In *Maravich v. Aetna Life and Cas. Co.*, 350 Pa.Super. 392, 504 A.2d 896 (1986), this court examined the admissibility of a fire marshall's opinion evidence which was based, in part, on the hearsay declarations of firemen at the scene who did not appear in court and who, therefore, could not be cross-examined. We concluded that, pursuant to *Thomas*, the testimony was admissible because the reports supplied by the firemen were "the type of information which a fire investigator would ordinarily rely upon in determining the cause of a fire". 350 Pa.Super. at 401, 504 A.2d at 901. In reaching this conclusion, the court relied upon the reasoning of a federal case in which an almost identical fact pattern prevailed. In *American Universal Insurance Co. v. Falzone*, 644 F.2d 65, 66 (1st Cir.1981), the circuit court stated:

> [S]ince it is reasonable for one state fire marshall to rely on the contemporaneous and on-the-scene opinions of other investigators on his team as to the portion of the

investigation that they carried out within their compe-
tence ... [the fire marshall's] testimony was properly
admitted.

This court in *Maravich* cited the above-quoted with ap-
proval.[12] We see no reason to treat the evidence in the
instant case any differently. In our view, it was equally
reasonable for the medical specialists whose testimony was
presented here to have relied, in part, upon the findings,
diagnoses and opinions of the other experts who were
consulted in the areas of their competence.[13]

■ The jury requested the doctors' reports during its
deliberations. The court sent various exhibits out with the
jury. Our review of the record leads us to conclude that
the only reports submitted to the jury on Primavera's
behalf were the reports of the testifying physicians and
non-testifying specialists. N.T. 11/5/89, p. 29–30. While
these reports, in parts, made some reference to the surgery,
tests and findings of the out-of-court specialists, these ref-
erences, like the testimonial references described in detail
above, were used as foundation for the ultimate conclusions
of the testifying doctors themselves. There was no error in
allowing the jury to see the reports. In fact, some cases

**12.** Whether the relied upon sources of information are sufficiently
reasonable and trustworthy is a matter left to the trial court's discre-
tion. Thus, while it is reasonable and customary for a fire marshall
to rely on the observations and opinions of fire fighters and other
investigators on the scene, other sources of information may not be as
trustworthy. For example, it may not be sufficiently reasonable for
an arson expert to disclose that in forming his opinion that a fire was
of an incendiary origin, he was told that a rumored arsonist had been
seen in the vicinity of the blaze. See Graham, *Handbook of Federal
Evidence*, § 703.1, p. 640–641 n. 17 (3rd ed. 1991).

**13.** The need for the trial court to exercise discretion in excluding
untrustworthy or highly prejudicial extrajudicial testimony is high-
lighted by this court's opinion in *Spotts v. Reidell*, 345 Pa.Super. 37,
497 A.2d 630 (1985). *Spotts* was a medical malpractice case in which
the physician being sued took the witness stand. During his testimo-
ny he sought to justify his course of treatment by relying on an out-of-
court conversation he had with another absent doctor. This court
refused to expand *Thomas* to permit this highly prejudicial, self-
serving and unreliable testimony. *Spotts*, however, is not analogous
to the instant case, as the above extended discussion of the disputed
testimony reveals.

have noted that the availability of the actual records upon which the expert bases his opinion may be helpful to jury in assessing the credibility of the expert's testimony. *See Bolus v. United Penn Bank,* 363 Pa.Super. at 270, 525 A.2d at 1227; *see also In re Preteroti,* 124 Pa.Cmwlth. at 543, 556 A.2d at 542 ("Because expert testimony based on reports not admitted into evidence is admissible as a hearsay exception, *Thomas,* we conclude that expert medical testimony based on reports which are admitted into evidence is also a hearsay exception".) We conclude that the trial court properly permitted the testifying experts to rely on the disputed reports and properly allowed the jury to see the reports during deliberations.

We next address the other grounds upon which appellant seeks a new trial. As noted above, the trial court took the issue of whether Primavera's colon cancer was asbestos-related away from the jury. Therefore, during jury instructions, the trial court charged the jury regarding its duty to ignore the evidence of colon cancer and in addition explained to the jury that the colon cancer issue was removed for reasons reflecting legal insufficiency. While at first the court's charge stated that this legal determination had been made for "technical reasons", the trial court later re-instructed the jury. The trial court emphasized that, although every effort was made to delete any references to colon cancer from all medical reports, should any such references remain, the jury was instructed to ignore them. The court also specified that the "scientific evidence itself did not meet the legal standard of proof" and that on the colon cancer issue "the plaintiff's proof did not meet his burden". Thus, any misunderstanding caused by the original instructions was removed by the fuller charge subsequently given. We conclude that, read in context and taken as a whole, the trial court's instructions were not an abuse of discretion. *See Lilley v. Johns–Manville Corp.,* 408 Pa.Super. 83, 95, 596 A.2d 203, 209 (1991).

Appellant argues that the testimony presented on behalf of Primavera by his expert witnesses was so contra-

dictory that a new trial should be granted or in the alternative this court should grant a judgment notwithstanding the verdict. Appellant relies on *Mudano v. Philadelphia Rapid Transit Co.*, 289 Pa. 51, 137 A. 104 (1927) and *Brannan v. Lankenau Hospital*, 490 Pa. 588, 417 A.2d 196 (1980) to support his contention. Appellant correctly cites these cases for the proposition that conflicts in testimony are fatal only if absolute, *Brannan*, and that if plaintiff's experts "so vitally disagree on essential points as to neutralize each other's evidence", relief is warranted, *Mudano*. Where appellant's argument fails, however, is in suggesting that the foregoing describes in any way whatsoever what transpired in this case.

Contrary to appellant's contentions, Dr. Harrer, the pathologist, testified that asbestos bodies were present in the lung tissue removed at Deborah. He stated, however, that he did not report a finding of asbestosis because the amount of tissue he was given to look at was inadequate to support such a finding from him. In fact, Dr. Harrer himself emphasized specifically that "[the] failure to make a diagnosis of asbestosis doesn't mean it's there or isn't there ... It's just, I don't have enough tissue to make that diagnosis in this specimen". This statement hardly constitutes an "absolute" contradiction of the other experts' conclusion that Primavera had asbestosis, asbestos-related lung disease, and pleural thickening attributable to asbestos exposure. In fact, Dr. Harrer's testimony does not raise a conflict at all.

Further, appellant states that Dr. Sokolowski, the pulmonary specialist, and Dr. Stoloff, the oncologist, contradicted each other in that the former did not diagnose asbestosis while the latter did. In the first place, even if this were so, the discrepancy is not a "conflict" unless it meets the standards from *Mudano* and *Brannan* articulated above. In any event, appellant mischaracterizes the testimony of the experts and appellant creates a "conflict" where none exists. Dr. Sokolowski reviewed X-rays and medical records of Primavera and concluded very early in his consulta-

tions with the patient that there had been "pleural changes consistent with the diagnosis of pleural asbestosis." This diagnosis was reported to Primavera's primary physician. This diagnosis was repeatedly confirmed throughout Sokolowski's testimony. He also stated that he equated pleural thickening to pleural asbestosis. Obviously, these findings did not contradict Dr. Stoloff's medical opinion that Primavera had "asbestos-related pleural plaque formation and thickening and interstitial fibrosis of the left lung" which he equated with asbestosis.[14]

Finally, appellant makes two additional arguments as a basis for relief. Appellant claims that he was denied the opportunity to present oral argument during the post-trial stages of the case. Second, appellant challenges the trial court's award of delay damages.

■ With respect to the first argument, appellant contends that after it filed its motion for post-verdict relief, it "anticipated" oral argument and an opportunity to present evidence on the issue of delay damages. However, while it is undisputed that subsequent to trial two lengthy post-trial conferences were held, no oral argument at which appellant could argue or present evidence on delay damages was conducted. The record does not disclose the basis, if any, for the trial court's refusal to hear argument on this matter. As a result we are unable to assess the merits of appellant's claim. We realize that the revised delay damages rule, Pa.R.C.P. 238, awards plaintiff pre-judgment interest except for periods of delay caused by the plaintiff or periods after which the defendant has made a written settlement offer. The record reveals no such periods that this court can discern. However, appellant avers that it had evidence on delay damages which it was denied the chance to present. Under the circumstances of this case, we conclude that a remand is warranted to allow appellant to argue its motion to bar delay damages.

14. Stoloff also testified that "the presence of asbestos bodies in the lung associated with fibrosis means there is disease there."

Order denying a new trial and judgment NOV is affirmed; order awarding delay damages is vacated and case remanded for a hearing on delay damages consistent with this opinion. Jurisdiction relinquished.