J-A20038-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| ELLEN KLEINER AND YURY KLEINER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellants | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RITE AID CORPORATION, RITE AID OF | : | No. 2886 EDA 2023 |
| PENNSYLVANIA, INC., JOHNSON & | : | |
| JOHNSON, LLT MANAGEMENT, LLC. | : | |
| IMERYS TALC AMERICA, INC., | : | |
| PERSONAL CARE PRODUCTS COUNCIL | : | |

Appeal from the Judgment Entered October 10, 2023
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 170102505

BEFORE: MURRAY, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.[*]

CONCURRING/DISSENTING MEMORANDUM BY McLAUGHLIN, J.:

**FILED MAY 28, 2025**

I respectfully dissent. In my view, the trial court abused its discretion in instructing the jury to disregard Dr. Rebecca Smith-Bindman's testimony referring to her systemic review and meta-analysis. I also find the error was not harmless, and a new trial is required.

Dr. Smith-Bindman testified that she is a professor at the University of California, San Francisco. N.T., 8/26/21 (Morning), at 16.[1] One of the departments in which she teaches is the Department of Epidemiology and

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Dr. Smith-Bindman gave over 400 pages of testimony. I will summarize only those parts relevant to the discussion of this issue.

Biostatistics. *Id.* at 16-17. In addition to her clinical endeavors and guiding her own research team, she teaches high school, medical, and post-graduate students. Relevant here, she teaches medical students "what epidemiology and biostatistics is, how to do research studies, and then, most importantly, how to look at research studies and understand what they're saying." *Id.* at 19.

Dr. Smith-Bindman explained that epidemiology is a branch of medicine that is "specifically focused on understanding who gets diseases, where they get those diseases, [and] why they get those diseases." *Id.* at 35. It examines "the distribution of diseases and risk factors" and "reflects study of the whole population rather than [the] study of individuals" *Id.* The study of whether talcum powder causes cancer "is epidemiology." *Id.* at 36. She testified to various publications, projects, and accolades in her field. *Id.* at 20-26. Dr. Smith-Bindman was offered and admitted "as an expert epidemiologist, [and] as an expert radiologist who specializes in women's health, including the diagnosis of ovarian cancer." *Id.* at 33.

The Kleiners asked Dr. Smith-Bindman "to review the data on what is known from the epidemiological literature on talcum powder and ovarian cancer." *Id.* at 34. In response, Dr. Smith-Bindman "read a large number of papers written on this topic[,] . . . performed [her] own review of the data[, and] read hundreds of other related articles[.]" *Id.* She looked at studies performed on the issue in the past 40 years, including systemic reviews and meta-analyses that have been conducted by other experts. *Id.* at 89.

Dr. Smith-Bindman explained that a systemic review and meta-analysis involves "look[ing] up the literature of everything that's been published," and "numerically summariz[ing] all the results." *Id.* at 93. She stated that when conducting a systemic review and meta-analysis, there are "very explicit rules for how to include studies, for how to exclude studies, [and] for how to statistically combine the studies." *Id.* at 89. Dr. Smith-Bindman testified she was previously a member of the Methodologic Committee of The Cochrane Collaboration, the organization which created the rules and statistical formulas for systematic reviews and meta-analyses. *Id.* at 95; *see also* N.T., 8/27/21 (Morning), at 56-57.

Dr. Smith-Bindman's review of the systemic reviews and meta-analyses conducted by other experts revealed that they consistently showed "women who use talcum powder are at a meaningfully greater risk of developing ovarian cancer[.]" N.T., 8/26/21 (Afternoon), at 9; *see also id.* at 13-14; N.T., 8/26/21 (Morning) at 96-101; 109-21; N.T. 8/27/21 (Afternoon) at 57-59.

Dr. Smith-Bindman also conducted her own systemic review and meta-analysis, focusing specifically on the relationship between the daily use of talcum powder on the genital area and the risk of ovarian cancer. N.T., 8/26/21 (Morning), at 94, 101. Her study revealed a risk factor of 1.43, *i.e.*, that the relative risk of ovarian cancer is 43 percent higher in women who were daily users of talcum powder. *Id.* at 102; 104-05. The confidence interval for the risk factor spanned from 1.15 to 1.71. *Id.* at 102. Dr. Smith-

Bindman explained that a confidence interval is the range of values where you could be 95 percent certain the true value for the risk factor lies. *Id.* at 74.

She stated these results are "highly statistically significant[.]" *Id.* at 105. She testified,

> I believe that a 43 percent increased risk for women who use talcum powder daily is a very meaningful risk. And, again, I think it's particularly important for ovarian cancer which has a very high mortality and where there's very little opportunity to find it early. And so it's important that we understand how much risk goes up. And 43 percent is a huge number to me. And I think the data supporting this risk is extremely strong.

N.T., 8/26/21 (Afternoon), at 12; *see also id.* at 10-11, 13-14, 16-22 (explaining the three criteria used to determine whether something is causal). Based on her "review of the medical and scientific literature, [her] own independent systematic review, [her] experience and expertise in the areas of epidemiology and women's health, including ovarian cancer," Dr. Smith-Bindman ultimately opined "that there's substantial evidence that supports a strong, positive, and causal association between ovarian cancer and genital exposure to Johnson's baby powder." *Id.* at 22.

Dr. Smith-Bindman stated that compared to the 1.43 "point estimate" for the risk factor, the confidence interval is more difficult to calculate. N.T., 8/26/21 (Morning), at 103. She testified that she asked Dr. Jane Hall, a Ph.D. biostatistician, to calculate the confidence interval for her. *Id.*; N.T., 8/27/21 (Morning), at 89.

Dr. Smith-Bindman stated Dr. Hall worked under her "close direction" in performing the calculations. N.T., 8/26/21 (Morning), at 103. After Dr. Smith-

Bindman extracted data from published reports and entered it into an excel spreadsheet, she told Dr. Hall what parameters to use to conduct her calculations. N.T., 8/27/21 (Morning) at 92-96, 103. The data that met the parameters set by Dr. Smith-Bindman came from 10 underlying studies. *Id.* Dr. Smith-Bindman had Dr. Hall calculate the confidence interval for each of those 10 qualifying studies.

Dr. Smith-Bindman testified that Dr. Hall had "used a statistical program . . . to calculate the confidence intervals using the data in the report[.]" *Id.* at 104. Dr. Smith-Bindman stated Dr. Hall put her numbers "into a computer program, and that computer program spit out the numbers[.]" *Id.* at 129; *see also* N.T., 8/27/21 (Afternoon), at 35 ("So I gave her the data, and she gave me back the numbers from running a random effects model in SAS using the input that I gave her"), 51 (Dr. Smith-Bindman agreeing she "gave [Dr. Hall] the request. She calculated it, much like we punch numbers in a calculator"). Dr. Smith-Bindman stated that she considers each of the confidence intervals provided by Dr. Hall to be "a calculation of a statistical program," and stated that she "would[ not] call [the resulting confidence interval] an opinion, [she] would call it data." N.T., 8/27/21 (Morning), at 124.

Dr. Smith-Bindman double-checked one of Dr. Hall's 10 confidence intervals to ensure Dr. Hall's methods were accurate. *Id.* at 121-23, 125-26. Dr. Smith-Bindman wrote the standard equation for obtaining a confidence interval on a display board for the jury, and offered to explain how to use it. N.T., 8/27/21 (Afternoon), at 18-20. She testified that it is the equation Dr.

Hall would have used, even though Dr. Smith-Bindman did not watch her do it. *Id.* at 20-21.

Dr. Smith-Bindman stated that while the width of a confidence interval can vary slightly based on how it is calculated, the results do not vary meaningfully. N.T., 8/26/21 (Morning), at 103. She also testified that a difference in the width of a confidence interval does not affect the point estimate. N.T, 8/27/21 (Morning), at 122. Dr. Smith-Bindman stated that she provided all the underlying data to Appellees. *Id.* at 129-30.

After calculating the 10 confidence intervals for the underlying studies, Dr. Hall then calculated the confidence interval for Dr. Smith-Bindman's study by running them through a statistical model that weighed each study. N.T., 8/27/21 (Afternoon), at 21-22, 30-32; *see also id.* at 60-61 (explaining how the results are weighted based on the size of the study). Dr. Smith-Bindman explained that while Dr. Hall decided what formula to use for this step, she would have used "a standard formula that the Cochrane Collaboration publishes[.]" *Id.* at 55. Dr. Smith-Bindman asked Dr. Hall to use the guidance of the Cochrane Collaboration, and agreed that Dr. Hall "didn't really have any discretion" when choosing which formula to use. *Id.* at 56; *see also id.* at 55 (stating that it was Dr. Hall's "job to follow the specifications. She didn't make up the specifications. She followed the software that the Cochrane Collaboration has devised for doing systematic reviews of relative risks"). When asked to produce the specific formula for the jury, Dr. Smith-Bindman offered to look up the Cochrane Collaboration formulas that Dr. Hall's software

would have used. *Id.* at 31-32. She stated that these lengthy formulas "go on for pages," and the calculations are routinely done by computer, but that she had been trained how to do them by hand, as an exercise. *Id.*

Dr. Smith-Bindman testified that it is customary for an epidemiologist conducting a systematic review to have a biostatistician do some of the calculations. *Id.* at 47. She agreed that she conducted the systemic review "in the same way that [she has] done that work as an epidemiologist in other studies that [she has] published in the peer-reviewed literature[.]" *Id.* at 48. She also testified that the calculation methods she directed Dr. Hall to use are generally accepted in the field of epidemiology. *Id.* at 61.

The court granted Appellees' motion to strike. It instructed the jury to disregard Dr. Smith-Bindman's testimony "about her opinions regarding a systemic review and meta-analysis concerning ten studies about women who used talc daily" because "she relied upon the statistical analysis of Dr. Jane Hall, who did not testify." N.T., 9/22/21 (Afternoon), at 26-27.

This was an abuse of discretion. In Pennsylvania, an expert opinion need not be based on things the expert personally observed or did. ***Commonwealth v. Fitzpatrick***, 349 A.3d 835, 857 & n.151 (Pa. 2026) (citing Pa.R.E. 703).[2] Rather, an expert may base an opinion on second-hand facts or data, provided they are the sort of facts or data that other experts in

---

[2] Rule 703 states, "An expert may base an opinion on facts or data in the case that the expert has **been made aware of** or personally observed." Pa.R.E. 703 (emphasis added).

the field would reasonably rely on when forming an opinion. Pa.R.E. 703. In contrast to the Federal Rules of Evidence,[3] our Rules of Evidence **require** an expert to disclose the underlying basis for their opinion during their direct testimony – regardless of the admissibility of that evidence. **See id.** ("if experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted"); Pa.R.E. 705 (requiring expert to state facts or data underlying their opinion); **Commonwealth v. Hairston**, 249 A.3d 1046, 1069 (Pa. 2021) (noting an expert "must testify regarding the source materials utilized to develop her conclusions and opinions," even if that evidence is inadmissible).

These principles were adopted by our Courts prior to their codification by the Rules of Evidence. **See Primavera v. Celotex Corp.**, 608 A.2d 515, 518-19 (Pa.Super. 1992) (discussing **Commonwealth v. Thomas**, 282 A.2d 693, 698 (Pa. 1971)); **Gunn v. Grossman**, 748 A.2d 1235, 1242 (Pa.Super. 2000). The reason for allowing an expert to rely on, and testify to, facts or data that "might otherwise be classified as hearsay," is that "the expert is assumed to have the mastery to evaluate the trustworthiness of the data upon which he or she relies, both because the expert has demonstrated his expert qualifications and because the expert regularly relies on and uses similar data in the practice of his or her profession." **Primavera**, 608 A.2d at 519; **see**

---

[3] **See** F.R.E. 703; Pa.R.E. 703, Comment; Pa.R.E. 705, Comment.

*also Boucher v. Pa. Hosp.*, 831 A.2d 623, 628 (Pa.Super. 2003) ("[H]earsay is admissible because the expert's reliance on the material provides its own indication of the material's trustworthiness"); Pa.R.E. 702 (stating requirements for expert qualification).[4]

At issue here is the principle that an expert may not simply repeat the opinion of another, non-testifying expert, as the sole foundation for the testifying expert's own opinion. *Nazarak v. Waite*, 216 A.3d 1093, 1109 (Pa.Super. 2019) (citing *Woodard v. Chatterjee*, 827 A.2d 433, 444 (Pa.Super. 2003)); *see Primavera*, 608 A.2d at 521 ("An 'expert' should not be permitted simply to repeat another's opinion or data without bringing to bear on it his own expertise and judgment"). Opinion testimony must be tested by cross-examination – not introduced through the backdoor of another expert's testimony.

However, "when [a testifying] expert witness has consulted numerous sources, and uses that information, together with his own professional knowledge and experience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as hearsay in disguise." *Primavera*, 608 A.2d at 520 (quoting *United States v. Williams*, 447 F.2d 1285, 1290 (5th Cir. 1971)). Thus, an expert may even testify about another expert's work, so

_____

[4] On at least one occasion, the Commonwealth Court has held that, even where the underlying data is inadmissible because it is scientifically flawed, an expert may nevertheless rely on it when forming an opinion, if it is of the type typically relied upon by other experts in the field. *See Eways v. Bd. of Comm'rs of Berks Cnty.*, 717 A.2d 8, 13-14 (Pa.Cmwlth. 1998).

long as the expert "uses several sources to arrive at his or her opinion, and has noted the reasonable and ordinary reliance on similar sources by experts in the field, and has coupled this reliance with personal observation, knowledge and experience[.]" *Id.* at 521.

Accordingly, this Court has held on multiple occasions that an expert may rely on the work or opinion of another expert, if reasonably and commonly done so in the relevant field and if it comprises a mere piece of the foundation supporting the testifying expert's own insights. *See, e.g., Nazarak*, 216 A.3d at 1109 (finding testimony admissible where expert "noted the records he reviewed and how his opinion was impacted by those records," and did not "parrot" another expert's report, but used it "in forming his own opinion"); *Gunn*, 748 A.2d at 1242 (finding expert testimony that relayed corroborating opinion of non-testifying expert permissible where it was not the exclusive basis for the testifying expert's opinion); *Primavera* at 521 (finding expert testimony admissible where "the expert use[d] several sources to arrive at his or her opinion, and has noted the reasonable and ordinary reliance on similar sources by experts in the field, and has coupled this reliance with personal observation, knowledge and experience"); *cf. Cacurak v. St. Francis Med. Ctr.*, 823 A.2d 159, 173 (Pa.Super. 2003) (finding trial court erred in admitting report of non-testifying expert offered "for the sole purpose of bolstering" testifying expert's opinion).

An expert's reliance on an outside data or opinion is tested not only by the requirement that the expert tell the jury about the basis of the opinion,

but also by cross-examination by other parties regarding the competency of the opinion and the reliability of the underlying information. *Primavera*, 608 A.2d at 520; *see also In re D.Y.*, 34 A.3d 177, 183 (Pa.Super. 2011) (*en banc*) (stating it is "the burden of opposing counsel to explore and expose any weaknesses in the underpinnings of the expert's opinion"). The opposition may also "present its own countervailing facts and figures and/or expert testimony to convince the factfinder that the weight to be given to the other side's expert testimony should be little or none." *Primavera*, 608 A.2d at 521 (quoting *In re Glosser Bros., Inc*., 555 A.2d 129, 142 (Pa.Super. 1989)). In addition, if the court finds the facts or data underlying the opinion is inadmissible, it may instruct the jury not to consider that part of the expert's testimony as substantive evidence. *See* Pa.R.E.703, Comment; Pa.R.E. 705, Comment. In the end, it is the province of the jury to decide the credibility of the expert opinion. *Sullivan v. Werner Co.*, 253 A.3d 730, 753 (Pa.Super. 2021); *Gunn*, 748 A.2d at 1240.

Here, Dr. Smith-Bindman "did not simply repeat [Dr. Hall's] opinion or data without bringing to bear on it [her] own expertise and judgment." *Nazarak*, 216 A.3d at 1109. Rather – and to the extent the numbers produced by Dr. Hall may even be construed as Dr. Hall's "opinion" – Dr. Smith-Bindman "use[d] several sources to arrive at . . .  her opinion, . . . noted the reasonable and ordinary reliance on similar sources by experts in the field, and . . . coupled this reliance with personal observation, knowledge and experience[.]" *Primavera*, 608 A.2d at 521 (citation omitted).

First, Dr. Smith-Bindman designed the study, set the rules and parameters, and collected and organized the underlying data.

Next, Dr. Smith-Bindman worked closely with Dr. Hall, instructing her on what steps to take in making her calculations, communicating with her about how her calculations were conducted, and even double-checking some of her work. Dr. Smith-Bindman further testified that other experts commonly use these methods, and outsource their calculations, when forming opinions in the field of epidemiology.

Dr. Smith-Bindman obviously did not have personal knowledge of the formula Dr. Hall used at every step, because she did not eyewitness Dr. Hall performing the calculations. She did testify, however, that it was a standard formula and that she could "guess" at those used by Dr. Hall. **See** Majority Op. at 13-14 (citing, *inter alia*, N.T., 8/27/21 (Afternoon), at 19).

For her Dr. Smith-Bindman's opinion to be admissible, there only needed to be sufficient testimony to support a finding that Dr. Hall's calculations were the sort of facts or data that experts in the field reasonably rely on. Pa.R.E. 703. As elucidated above, she gave such testimony. Her inability to recall the formula from memory went to the weight and credibility of her opinion, not its admissibility. By way of analogy, a research scientist need not produce every lab technician working under their direction for cross-examination before they are allowed to opine on the results of their experiment. As an expert, Dr. Smith-Bindman was permitted to rely on Dr. Hall's calculations. **Primavera**, 608 A.2d at 519.

Moreover, Dr. Smith-Bindman explained that she considered Dr. Hall's calculations to be reliable because Dr. Hall worked under Dr. Smith-Bindman's close direction. Dr. Smith-Bindman was able to explain the steps Dr. Hall would have taken at every stage of the process: by using the Cochrane Collaboration guidelines and standard formulas run through computer programs – steps that Dr. Smith-Bindman herself helped design, and steps which she teaches to others in a professional capacity. She testified that Dr. Hall had no real discretion, functioning akin to a calculator. She stated that any slight variation in the calculations would not have meaningfully affected the confidence intervals and would have had no impact on the point estimates.

I disagree with the Majority's assessment that Dr. Hall had autonomy in choosing what data to consider. The majority states that "Dr. Smith-Bindman generally identified for Dr. Hall which studies to consider, but . . . Dr. Hall specifically ascertained which studies should be included and thereafter analyzed." Majority Op. at 13 (citing N.T., 8/27/21 (Morning), at 94-96). However, Dr. Smith-Bindman testified that she compiled a large amount of data and set the parameters for Dr. Hall to "ascertain" the data that fell within those parameters, and the results implicated 10 studies. *See* N.T., 8/27/21 (Morning), at 94 (when asked if she instructed Dr. Hall to use a particular study, Dr. Smith-Bindman testifying, "I told her to make decisions on inclusion by a proxy for the studies that were meeting the inclusion criteria. So by that proxy, I think I said to use [one of the 10 studies] because that, by proxy, had regular use"). As the trial court pithily summarized this aspect of her

testimony, "You gave her a bag of M&Ms and you told her pick out all the red ones, and she picked out all the red ones[.]" *Id.* at 95.

I also disagree with the Majority's assertion that Dr. Smith-Bindman conceded that Dr. Hall made her own "judgments" when performing the calculations. *See* Majority at 14 (citing N.T., 8/27/21 (Afternoon), at 33). Dr. Smith-Bindman explained that Dr. Hall documented any "assumptions" she made when inputting the data into the statistical model and explained them to Dr. Smith-Bindman, who explained them for the jury. *See* N.T., 8/27/21 (Morning) at 118-19, 127-30; N.T., 8/27/21 (Afternoon), at 33. This documentation was shared with Appellees and introduced into evidence. *See* N.T., 8/27/21 (Morning) at 127; N.T., 8/27/21 (Afternoon), at 33.

Finally, importantly, Dr. Smith-Bindman's opinion was not just an announcement of the final numbers generated by Dr. Hall's calculations. Dr. Smith-Bindman used her own expertise to interpret them. She opined that the resulting confidence interval was "relatively narrow" and that the risk factor of 1.43 is statistically significant and indicates a causal relationship between the daily use of talc powder and ovarian cancer.

This was not a mere repeat of another expert's identical opinion, meant to bolster her own. *Cf. Cacurak*, 823 A.2d at 173. Dr. Smith-Bindman does not even consider the results of Dr. Hall's calculations to be an opinion. Indeed, there is no evidence that Dr. Hall would have designed this same study, selected the same data, utilized the Cochrane Collaboration guidelines, or opined, herself, that the results indicate there is a 1.43 risk factor with a

confidence interval of 1.15 to 1.71 between the daily use of talcum powder and ovarian cancer. It was Dr. Smith-Bindman alone who drew these conclusions, based on multiple sources and her own expertise. And it was Dr. Smith-Bindman, alone, who opined on the significance of the results.

Dr. Smith-Bindman was required by the Rules of Evidence to provide the basis for her own opinion, and she did so. She also testified that Dr. Hall's work was of the sort that epidemiologists reasonably rely on. **See** N.T., 8/27/21 (Afternoon), at 47. Appellees had the opportunity to challenge the accuracy of the underlying calculations on which Dr. Smith-Bindman based her opinion, as they had access to the same underlying data and elicited the formulas and procedures used for the calculations. To the extent that the testimony regarding Dr. Hall's contributions constituted inadmissible hearsay, the court could have instructed the jury not to consider it as substantive evidence. **See** Pa.R.E.703, Comment; Pa.R.E. 705, Comment. Instructing the jury to fully disregard the entirety of Dr. Smith-Bindman's opinion regarding the results of the study was an abuse of discretion.

Despite the weight of Dr. Smith-Bindman's other testimony, her testimony regarding her own systemic review and meta-analysis was particularly damning for Appellees. I believe the jury instruction telling them to disregard this evidence controlled the outcome of the case and is thus grounds for a new trial. **See Lockley v. CSX Transp. Inc.**, 5 A.3d 383, 388 (Pa.Super. 2010).

I agree with the majority's other conclusions. Therefore, and despite my great respect for the learned majority, I concur in part and dissent in part.