2020 PA Super 298

| | | |
|---|---|---|
| DARLENE ADAMS, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF TRINA ADAMS | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : : | |
| v. | : : | |
| | : | No. 2033 EDA 2019 |
| RISING SUN MEDICAL CENTER; MERCY SUBURBAN HOSPITAL; DR. WAYNE GIBBONS; DR. EDWARD ALEXANDER; JAMES G. MCHUGH, M.D.; LINDSAY ANONICH; MERCY HEALTH SYSTEM AND TEAM HEALTH EAST | : : : : : : : : : | |

Appeal from the Judgment Entered May 14, 2019
In the Court of Common Pleas of Philadelphia County Civil Division at No(s): 150100408

| | | |
|---|---|---|
| DARLENE ADAMS, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF: TRINA ADAMS | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| | : | |
| RISING SUN MEDICAL CENTER, MERCY SUBURBAN HOSPITAL AND MERCY HEALTH SYSTEM, DR. WAYNE GIBBONS, DR. EDWARD ALEXANDER, JAMES G. MCHUGH, M.D., LINDSAY ANONICH AND TEAMHEALTH EAST | : : : : : : : | No. 3283 EDA 2019 |
| APPEAL OF: LINDSAY ANONICH AND JAMES G. MCHUGH | : : | |

Appeal from the Judgment Entered May 14, 2019

J-A17014-20

In the Court of Common Pleas of Philadelphia County Civil Division at No(s): No. 150100408

BEFORE: BOWES, J., McCAFFERY, J., and FORD ELLIOTT, P.J.E.

OPINION BY BOWES, J.:                 **FILED: DECEMBER 29, 2020**

Darlene Adams, individually and as Administratrix of the Estate of Trina Adams, appeals from the May 14, 2019 judgment entered in her favor against Rising Sun Medical Center ("Rising Sun") and Dr. Edward Alexander, ("Dr. Alexander"), and in favor of Mercy Suburban Hospital and Mercy Health System (hereinafter "Mercy"), Dr. Wayne Gibbons, James McHugh, M.D., and Lindsay Anonich ("P.A. Anonich").[1] P.A. Anonich and Dr. McHugh filed a cross-appeal.[2] After thorough review, we vacate the judgment and remand for a new trial.

_____

[1] Defendant Team Health East was dismissed from the case following the grant of its motion for summary judgment.

[2] James McHugh, M.D. and Lindsay Anonich also filed a motion to quash this appeal because Administratrix did not initially file a *praecipe* for judgment, and then when ordered to do so, allegedly refused to do so. This Court denied the motion without prejudice for these parties to raise the issue again before this panel, which they did. The record reflects that although Administratrix made some missteps, she eventually succeeded in entering judgment on the verdict, and did not refuse to comply with this Court's order. **Cf. Johnston the Florist, Inc. v. TEDCO Const. Corp.**, 657 A.2d 511 (Pa.Super. 1995) (holding Superior Court has no authority to review merits of appeal in face of refusal by parties to enter judgment). Hence, the motion to quash is denied.

- 2 -

Forty-two-year-old Trina Adams ("Trina" or "Decedent") was a teacher in Philadelphia. In November 2012, she was injured while intervening to halt an altercation involving students at school, and placed on disability leave. She sought physical therapy for her injuries at Rising Sun, which was described as a multi-disciplinary therapy group, consisting of two physicians, a licensed physical therapist, and at least one chiropractor.[3] *See* N.T. 4/1/19 a.m., at 80. She was using a cane to ambulate.

On January 2, 2013, Trina, accompanied by her mother, Administratrix herein, went to the Mercy Emergency Room ("ER") with new complaints. Administratrix was present with Trina throughout the ER visit.[4] From the medical records and the testimony of the nurses, we glean the following. At the triage desk, Jennifer Bender, R.N. obtained information from Trina and recorded her initial complaint on the intake form as "right hip/leg pain." Mercy Suburban Primary form, 1/2/13, at 1. Her "Presenting Problems" were

---

[3] The record reveals that Dr. Alexander is one of two owners of Rising Sun. *See* N.T. 4/1/19 a.m., at 80. It was unclear at trial whether Dr. Alexander is a physician. Dr. Gibbons testified that he had no equity interest in Rising Sun, *id*., and that he was an independent contractor. *See* N.T., 4/1/19 p.m., at 24.

[4] Defendants prevailed on their motions *in limine* to preclude Administratrix from testifying as to what her daughter told the nurses and P.A. Anonich about her physical complaints. Administratrix would have testified that Decedent reported that she had passed out earlier that day for a period of fifteen to twenty minutes, and that she had a family history of deep vein thrombosis and pulmonary embolism. This is one of many errors Administratrix cites in support of her claim that the trial court erred in denying her motion for new trial.

recorded as "Hip/Thigh Injury-Pain-Swelling." *Id*. at 2. Under Triage Notes, Nurse Bender wrote "patient began with right hip/leg pain 4 days ago, getting progressively worse." *Id*.

Trina was assessed first by LaToya Bonk, R.N., and then seen by P.A. Anonich, who verified Trina's medical history and performed a physical examination. After an x-ray, P.A. Anonich concluded that Trina was suffering from trochanteric bursitis in her right hip, and prescribed hydrocodone for pain, a steroid medication, and crutches. Trina was told to follow up with an orthopedic physician in a few days, or return to the ER if her condition worsened. Dr. McHugh, P.A. Anonich's supervising physician, reviewed the chart two hours later and did not find any matter for concern.

During the next two weeks, Trina continued to undergo therapy at Rising Sun. The medical records from that facility indicate that Dr. Gibbons, who described himself as a semi-retired physician who was transitioning to supervising physical therapy clients, provided medical care as a professional courtesy to Trina because her brother was a chiropractor at the facility. For instance, he prescribed insulin on occasion for Trina's diabetes. He ordered an MRI shortly before her death, but it is unclear whether the imaging was performed. Dr. Gibbons also ordered a blood test. The results, which reflected a critical value for glucose, were faxed to Dr. Alexander on the evening of January 16, 2013, but there was no one there to receive them and

communicate them to Trina. Trina died suddenly at home on January 17, 2013.

An autopsy was performed the next day by the Philadelphia Medical Examiner, Edwin Lieberman, M.D. Before any results were reported, Administratrix arranged for a private autopsy by Richard Callery, M.D., Chief Medical Examiner for the State of Delaware. During the autopsy he conducted one week after Trina's death, Dr. Callery found small emboli in Decedent's lungs and some evidence of debris from a prior clot in Decedent's right leg. He concluded that she died of a multiple pulmonary emboli secondary to DVT. Dr. Lieberman subsequently reported his results. He found a pinhole-sized lumen in one of Decedent's arteries and concluded that she died of atherosclerosis, with underlying diabetes and high blood pressure.

On January 6, 2015, Administratrix commenced this wrongful death and survival action against the various medical providers by writ of summons. She subsequently filed a complaint alleging that the defendants' failure to diagnose deep vein thrombosis ("DVT") caused or increased the risk of Trina's death due to pulmonary embolism ("PE"). Specifically, Administratrix pled that P.A. Anonich and Dr. McHugh, as well as other agents or employees of Mercy, negligently failed to diagnose and treat the Decedent for a DVT, commonly known as a blood clot, when she presented to the ER on January 2, 2013. In addition to claims of vicarious liability and ostensible agency against Mercy for

the conduct of its employees and agents, Administratrix asserted a claim of corporate negligence against Mercy that was dismissed prior to trial.

Administratrix also pled claims of corporate negligence against Rising Sun, as well as claims of vicarious liability/ostensible agency for the negligence of Dr. Alexander and Dr. Gibbons in failing to diagnose the DVT. Defendants Mercy, Dr. McHugh, and P.A. Anonich filed cross-claims against Rising Sun and Dr. Alexander and Dr. Gibbons. Due to the negligence of all or some of these defendants, Administratrix maintained that portions of the untreated DVT blood clot in Decedent's leg broke off and traveled to Decedent's lungs, causing multiple pulmonary emboli, and resulting in her death on January 17, 2013.

During the pendency of the case, litigation was twice placed on deferred status due to Dr. Alexander's ongoing Chapter 7 bankruptcy. On November 22, 2017, the Bankruptcy Court ordered that the case be dismissed as to Dr. Alexander, but that he participate in discovery. In light of the Bankruptcy Court order, Dr. Alexander asked the trial court to dismiss him from the lawsuit, but the trial court refused.

After discovery and a plethora of pretrial motions, a jury trial commenced on March 22, 2017, before the Honorable Rosalyn K. Robinson and a jury. Rising Sun and Dr. Alexander did not participate in the trial. The remaining defendants disputed both negligence and the cause of death. Neither Dr. Lieberman nor Dr. Callery testified at trial, although their autopsy

findings were relied upon by the parties' expert pathologists Harry Kamerow, M.D. and Lawrence Kenyon, M.D., in forming their opinions as to cause of death.

At trial, Administratrix did not present any expert testimony of negligence on the part of Dr. Alexander or Dr. Gibbons, or corporate negligence on the part of Rising Sun. At the close of her case, Administratrix requested that nonsuit be entered in favor of the two physicians. That motion was denied when the remaining defendants, who had filed cross-claims against Dr. Gibbons, Dr. Alexander, and Rising Sun, objected, representing to the court that they would introduce evidence in support of their cross-claims. At the close of all of the evidence, and no expert testimony having been produced against these defendants, Administratrix requested that a directed verdict be entered in favor of Dr. Gibbons, Dr. Alexander, and Rising Sun. The trial court denied the motion, and Dr. Gibbons, Dr. Alexander, and Rising Sun remained in the case and on the verdict slip.

On April 9, 2019, the jury returned a verdict of $200,000 in the wrongful death action and $330,400 in the survival action, for a total of $530,400 in damages against Dr. Gibbons, Dr. Alexander, and Rising Sun only. Dr. McHugh and P.A. Anonich were found not negligent, thus absolving Mercy of any liability based on an ostensible agency theory. The jury apportioned liability as follows: Rising Sun 21.5%, Dr. Gibbons 10%, Dr. Alexander 21.5%, and Decedent 47%, and the trial court molded the verdict accordingly.

Administratrix and Dr. Gibbons filed post-trial motions. The trial court granted judgment notwithstanding the verdict ("JNOV") in favor of Dr. Gibbons after concluding that there was no expert testimony introduced that he had deviated from the standard of care, but did not disturb the jury's apportionment of liability against the other parties. The court denied Administratrix's post-trial motion alleging that nonsuit and a directed verdict should have been granted in favor of Dr. Alexander for the same reason. Administratrix's motion for new trial based on evidentiary errors and errors in jury instructions was denied. Motions for additur and a partial new trial limited to damages premised on claims that the verdict was inadequate and against the weight of the evidence were similarly denied. The court awarded delay damages to Administratrix.

Administratrix timely appealed and complied with Pa.R.A.P. 1925(b). Dr. McHugh and P.A. Anonich filed a cross-appeal maintaining that they should be excused from any new trial as the jury exonerated them and there was no reversible error. In the alternative, Dr. McHugh and P.A. Anonich argue that the JNOV entered in favor of Dr. Gibbons be reversed, and that he be required to participate in any new trial.[5] **See** Brief of McHugh and Anonich at 66.

---

[5] Mercy, P.A. Anonich, and Dr. McHugh argued at trial that Trina did not die from a pulmonary embolism caused by a DVT present when she was in the E.R. on January 2, 2013. Instead, they maintained that she died of an arrhythmia, and that her critically elevated glucose levels "basically tip[ped] the scales." N.T. 4/1/19 p.m., at 100-01; N.T. 4/2/19 p.m., at 18-20.

Administratrix presents eighteen issues, with additional sub-issues, which we have re-ordered for ease of disposition:

1. Did the trial court err in precluding [Administratrix] from making any reference to and/or offering any testimony regarding the decedent's report of a family history of deep vein thrombosis, pulmonary emboli, and syncope at trial?

a. Did the trial court err in refusing to allow [Administratrix] to present any evidence that the Adams family drove Tina to the Mercy Suburban Hospital even though it was not the closest hospital because Trina's brother had treated there previously for a DVT?

b. Did the trial court err in precluding [Administratrix] from making any reference to and/or offering any testimony regarding the statements of Trina and her mother in the ER including a statement that Trina shouldn't think that she could come to Mercy Suburban from Philadelphia to get a note to get out of work?

2. Did the trial court make numerous erroneous evidentiary rulings allowing prejudicial evidence and precluding relevant evidence?

a. Did the trial court err in permitting defendants to introduce evidence at trial regarding the criminal history of Dr. Richard Callery?

b. Did the trial court err and abuse its discretion in permitting evidence of the criminal history of Richard Callery, M.D. under the guise of an attempt to authenticate hearsay materials?

_____

However, they never pled nor proved that Dr. Gibbon or Dr. Alexander were negligent in causing or increasing the risk of her death from arrhythmia. Moreover, the cross-claims of Mercy, P.A. Anonich, and Dr. McHugh against Dr. Alexander and Dr. Gibbons were grounded in Administratrix's claim that Trina died due to multiple PE resulting from an undiagnosed DVT, and they offered no expert testimony to support such claims.

c. Did the trial court err in precluding [Administratrix] from making any reference to and/or offering any testimony regarding Keeping Children First, [D]ecedent's non-profit organization?

3. Did the trial court err in denying motions for non-suit and directed verdict and by including Rising Sun Medical Center, Dr. Gibbons, and Dr. Alexander on the verdict sheet, despite the fact that no factual or expert evidence of their liability was presented and Dr. Alexander was previously dismissed by the bankruptcy court[?]

4. Did the trial court err in giving an adverse inference jury instruction concerning missing witness, including without limitation, instructing the jury in accordance with Pennsylvania Suggested Standard Civil Jury Instruction 5.40 entitled "Failure to Call a Witness – Adverse Inference" with respect to Dr. Callery?

5. Did the trial court err in giving an adverse inference jury instruction concerning missing evidence, including without limitation instructing the jury in accordance with Pennsylvania Suggested Standard Civil Jury Instruction 5.30 entitled "Failure to Produce Evidence – Adverse Inference" regarding photographs and tissue slides taken samples of the conditions found during autopsy by Dr. Callery during Trina's autopsy?

6. Did the trial court err in precluding [Administratrix] from offering testimony of PA Anonich's dismissive treatment of Trina and the statements she made to Trina and her mother in the ER including a statement that Trina shouldn't think that she could come to Mercy Suburban from Philadelphia to get a note to get out of work?

7. Did the trial court err in precluding Dan Mayer, M.D. from testifying regarding the ER nurse's deviation from the standard of care and concerning ESI classification in the ER?

8. Did the trial court err and abuse its discretion by precluding Dr. Kamerow from testifying that Trina Adams had a DVT on Jan 2, 2013 when she presented to the ER for treatment and likewise erred in precluding Dr. Kamerow from testifying regarding anything related to ER care and DVT, then permitting Dr. Kenyon to testify regarding those same issues?

- 10 -

9. Did the trial court err and abuse its discretion by improperly allowing direct examination but prohibiting cross-examination of defense expert Dr. Karras on "the law" of Pennsylvania with which he said he was familiar and relied on in forming opinions, including the provisions of the Pennsylvania Code regarding duties of supervising physician regarding care provided by a physician assistant?

10. Did the trial court err in precluding [Administratrix] from reading in the transcript of Dr. Alexander as rebuttal testimony?

11. Did the trial court err by not properly instructing the jury on the computation of damages by providing an explanation to the jury that they were to determine damages outside of any determination of contributory negligence and the court will make any allocation of responsibility for the damages?

12. Did the trial court err by not charging the jury on vicarious liability and ostensible agency and its implications concerning vicarious liability?

13. Did the trial court err by not including Mercy Suburban Hospital on the verdict sheet, and permitting Mercy to present a closing argument while refusing to charge the jury on vicarious liability and ostensible agency?

14. Did the trial court err by leaving Mercy Suburban Hospital off the verdict sheet?

15. Did the trial court err in not providing the jury with a redacted version of the exhibits, including but not limited to, redacted versions of the autopsy reports and medical records?

16. Is [Administratrix] entitled to a new trial on damages pursuant to Pa.R.Civ.P. 227.1(a)(1) and since the jury's damage award was against the weight of the evidence?

17. Is [Administratrix] entitled to an additur as the verdict is insufficient and bears no reasonable relationship to the loss suffered by the decedent, Trina Adams?

18. Is [Administratrix] entitled to a new trial on all issues pursuant to Pa.R.Civ P. 227.1(a) due to the numerous errors and abuses of

discretion during the trial, which individually and collectively warrant a new trial?

Administratrix's brief at 5-8.

Administratrix contends that the trial court erred in denying her motion for a new trial on numerous grounds. When considering such a challenge, our standard of review is

> whether the trial court clearly and palpably committed an error of law that controlled the outcome of the case or constituted an abuse of discretion. In examining the evidence in the light most favorable to the verdict winner, to reverse the trial court, we must conclude that the verdict would change if another trial were granted.

*Talmadge v. Ervin*, 236 A.3d 1154, 1156 (Pa.Super. 2020) (quoting *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 707 (Pa.Super. 2000)).

Administratrix claims first that the trial court erred precluding her from testifying as to what Decedent told health care providers in the emergency room. We review a trial court's decision concerning the admissibility of evidence for an abuse of discretion. *Commonwealth v. LeClair*, 236 A.3d 71, 78 (Pa.Super. 2020). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Id*. (quoting *Commonwealth v. Belknap*, 105 A.3d 7, 9-10 (Pa.Super. 2014)). In addition, before a ruling on evidence constitutes reversible error, it must

have been harmful or prejudicial to the complaining party. ***See Lykes v. Yates***, 77 A.3d 27, 32 (Pa.Super. 2013).

According to Administratrix, she was present when Decedent reported to P.A. Anonich a family history of DVT, persistent pain and swelling in her right leg, and that she had experienced an episode of syncope earlier that day. At her deposition, Administratrix testified to the following:

> A. . . . [Trina] told [P.A. Anonich] that she was in severe pain. And it was her leg that she spoke of, and that's when she said I'm just concerned that it's not a blood clot because of my family's history.
>
> Q. Did she tell her that she passed out?
>
> A. Absolutely.

Deposition of Administratrix Darlene Adams, 7/27/16, at 199 (attached as Exhibit A to Plaintiff's Response in Opposition to the Motion in *Limine* of Defendant, James G. McHugh, M.D., to Preclude Plaintiff, Plaintiff's Counsel, and any of Plaintiff's Witnesses at Trial from Referencing and/or Testifying About the Decedent's Family History of Deep Vein Thrombosis (DVT) and Pulmonary Emboli (PE)). Administratrix testified further that Trina expressed concern about the fact that her brother had suffered from emboli.

Defendants filed motions *in limine* to preclude Administratrix from offering such testimony at trial. While Administratrix concedes that testimony consistent with that offered at her deposition would constitute hearsay, she maintains that such testimony was admissible as it fell within the hearsay exception for statements made for purposes of diagnosis and treatment. ***See***

- 13 -

Pa.R.E. 803(4).[6]  Furthermore, she contends that it was highly probative evidence of what Mercy personnel knew when they failed to diagnose a DVT, and that P.A. Anonich and her supervisor, Dr. McHugh, were negligent in ignoring signs of a potential DVT.  Consequently, Administratrix asserts that their failure to timely diagnose and treat that condition increased the risk of Trina's premature death from a pulmonary embolism.  *See* Administratrix's brief at 19.

In defense of the trial court's preclusion of such testimony, Mercy offers the novel argument that a statement made for purposes of medical treatment qualifies for the hearsay exception at Rule 803 only if it is proffered by a healthcare provider.  While Mercy acknowledges that the rules of evidence do not expressly contain such a limitation, it argues that "a common sense reading of the exception and the cases construing its application" indicate that such a limitation exists.  Mercy's brief at 12.  Mercy asserts that all published

_____

[6] (4) Statement Made for Medical Diagnosis or Treatment. A statement that:

(A)   is made for — and is reasonably pertinent to — medical treatment or diagnosis in contemplation of treatment; and

(B)    describes medical history, past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to treatment, or diagnosis in contemplation of treatment.

Pa.R.E. 803(4).

appellate cases that have interpreted this exception have involved situations where the hearsay statements were made to providers of medical care and it was the provider seeking to offer the hearsay testimony at trial. ***See id***. (citing ***e.g.***, ***Commonwealth v. D.J.A.***, 800 A.2d 965, 975 (Pa.Super. 2002) (applying the exception to allow a physician to testify as to a sexual assault victim's hearsay statement made to the physician during an examination); ***Commonwealth v. Fink***, 791 A.2d at 1246 (same); ***Belknap***, ***supra*** (applying the exception to allow a police officer to testify as to hearsay statements that were made by friends of an unconscious drug overdose victim to the officer while he was attempting to resuscitate the victim). Mercy represents that there are "no published cases in Pennsylvania where an appellate court has held that a non-medical provider bystander, who claims to have overheard such a statement, should be permitted to present such hearsay testimony, much less when that bystander is also the plaintiff." Mercy's brief at 13.

Dr. McHugh and P.A. Anonich advance a different rationale for the exclusion of Decedent's statements to P.A. Anonich. They argue that even when an out-of-court statement falls within a recognized hearsay exception, it must still carry with it "guarantees of trustworthiness" and "a reliable" basis in order to be admissible. Brief of McHugh and Anonich at 25 (citing ***Commonwealth v. Smith***, 681 A.2d 1288, 1290 (Pa. 1996)). They suggest

further that the statements, which were offered by Administratrix, were made for purposes of litigation, and lacked reliability. *Id*. at 24.

Administratrix counters that there is nothing in the Pennsylvania Rules of Evidence that suggests that a statement can only qualify for this hearsay exception if it is offered by a healthcare provider. She argues further that the preclusion of this testimony violated Pennsylvania Rules of Evidence 401, 402, and 803(4), and constituted error and an abuse of discretion, resulting in unfair prejudice necessitating a new trial. *See* Administratrix's brief at 19.

The trial court noted that the question whether a statement falling within the medical diagnosis hearsay exception "can be relayed to a trial court by a third-party observer to the conversation who was not personally being treated or diagnosed at the time - has not been squarely raised or answered by case law in this Commonwealth." Trial Court Opinion, 6/28/19, at 13. The trial court expressed concern that the out-of-court statement lacked corroboration as the "Mercy Hospital records do not reflect, and they occasionally contradict the assertions, that [Decedent] reported to any Mercy staff that she had fainted prior to arriving at Mercy, that she had a family history of DVT, or that that her brother had previously been treated at Mercy for a DVT." *Id*. at 11. The trial court found, "based on its first-hand view of the testimony and witnesses, that the statements [Administratrix] desired to introduce lacked reliability, because no provider of medical treatment could testify to it, but only [Administratrix]." *Id*. at 13. The court reasoned that,

- 16 -

> [i]n the absence of guiding case law on the medical diagnosis exception, and given the crucial objective of ensuring that reliable testimony is presented to the jury, we found that this wholly-uncorroborated account of [Decedent's] statement, presented not by the person to whom the statement was allegedly made (PA Anonich) but by a third-party observer (and an interested party to the outcome of this litigation) of the conversation between the declarant and PA Anonich, did not have the trustworthiness required of statements covered by the medical diagnosis exception.

*Id*. The court went on to add: "We further do not believe the exception contemplates that any alleged observer to a conversation between two other people may simply repeat what she thinks was said between them." *Id*. On that basis, the court precluded the statement as inadmissible hearsay.

The following principles inform our review. "'[H]earsay' is defined as an out-of-court statement, which is offered in evidence to prove the truth of the matter asserted." *Commonwealth v. Busanet*, 54 A.3d 35, 68 (Pa. 2012) (quoting Pa.R.E. 801). For hearsay purposes, the "declarant" is defined as the person who makes the out-of-court statement, not the person who repeats it on the witness stand. *See* Pa.R.E. 801(b). Generally, hearsay is inadmissible because it is deemed untrustworthy since it was not given under oath and subject to cross-examination. *See* John Henry Wigmore, 5 Wigmore on Evidence, §§ 1420 & 1422 at 202-03, 204-05 (3d ed. 1940). However, the law recognizes that there are some circumstances attendant to the making of out-of-court statements that provide sufficient guarantees of their trustworthiness to depart from the requirement that the declarant be subject to cross-examination. That is the rationale underpinning exceptions to the

hearsay rule. Thus, it is burden of the proponent of hearsay evidence to convince the court of the admissibility of the evidence under an exception before such testimony will be admitted. **Smith**, **supra** at 1290.

In response to the defense motion *in limine* seeking to preclude Administratrix from testifying as to what Trina reported to P.A. Anonich, Administratrix invoked the hearsay exception for medical treatment and diagnosis.[7] Administratrix argued below, and again on appeal, that Trina made the statements for the purpose of receiving medical treatment, and that the statements regarding her family history of DVT and an earlier episode of syncope were necessary and proper for diagnosis and treatment, thus satisfying the two requirements for the application of the exception.

In seeking to exclude such testimony, the defendants urged the trial court, and now this Court, to graft onto the hearsay exception new and additional requirements, namely: that the statement be offered by a medical provider, and/or corroborated by a third person, or that the statement be offered by someone who has no interest in the litigation. They suggest that absent such conditions, the hearsay statements are not sufficiently trustworthy to be admitted. The crux of their argument is that because the statements were offered by Administratrix, who has a vested interest in the

---

[7] Administratrix did not argue below or on appeal that the proffered testimony was not hearsay as it was not offered for its truth, but merely to establish that the statements were made to P.A. Anonich.

litigation, they are analogous to statements made to a person retained solely for purposes of litigation rather than treatment.

It has long been the law of Pennsylvania that "statements to a doctor were admissible insofar as they were necessary and proper for diagnosis and treatment of the injury and referred to symptoms, feelings and conditions." *Smith*, *supra* at 1291 (citations, quotations marks, and footnote omitted). The exception is codified in Pa.R.E. 803(4), and the declarant need not be available as a witness in order for the hearsay statement to be admissible. There are only two requirements for a hearsay statement to come within this exception: "First, the declarant must make the statement for the purpose of receiving medical treatment, and second, the statement must be necessary and proper for diagnosis and treatment[.]" *Id*. As this Court reaffirmed in *Phillips v. Lock*, 86 A.3d 906, 922-23 (Pa.Super. 2014),

> testimony repeating out-of-court statements which were made for the purposes of receiving medical treatment are admissible as substantive evidence. . . . Nothing is better settled than that statements of a patient to his physician, as to the character and seat of his sensations, made for the purpose of receiving medical advice, are competent evidence. . . .

*Id*. (quoting *Smith*, *supra*, at 1291).

Much of the litigation surrounding this hearsay exception has involved its breadth. *See e.g.*, *Cody v. S.K.F. Industries, Inc.*, 291 A.2d 772, 776 (Pa. 1972) (expanding law to permit medical testimony regarding the cause of the injury); *Smith*, *supra* (holding that a child's identification of her abuser was not germane to her medical treatment or diagnosis, and hence,

- 19 -

did not fall within the hearsay exception); ***but see Fink***, ***supra*** (holding physician permitted to testify as to what the victim said about incidents of abuse, without identifying the perpetrator, as it was conveyed the purpose for treatment).

We find first that there is no legal support for the position advanced by Mercy that only a health care provider can testify as to statements made for purposes of medical treatment. Notably, in ***Belknap***, ***supra***, a police officer rendering first aid was permitted to testify that third parties told him that the victim overdosed on heroin. ***See also*** Pa.R.E. 803(4) official comment (stating "[t]his rule is not limited to statements made to physicians[,]" and statements as to causation, *e.g.* how the person sustained the injury, may be admissible). In such circumstances, the out-of-court statements will necessarily be reported by non-healthcare providers.

Nor is there any requirement of corroboration before the proffered statement is admissible, or any notion of disqualification where the person offering such evidence is an interested party. Defendants' arguments ignore the very reason exceptions to the hearsay rule were carved out: that they are uttered in circumstances where the reliability of the **declarant's** out-of-court statement is inherently trustworthy and there is little motive to fabricate. Thus, in creating exceptions, the focus was on the **declarant**, not on the person reporting the out-of-court statement.

Administratrix was present when Trina was examined by P.A. Anonich, a fact corroborated by the note in the medical record that the patient's family was at bedside. Administratrix purported to recall what her daughter told medical providers in her presence and she was competent to testify as to what was said. As with any witness, cross-examination could be used to explore whether Administratrix accurately perceived the situation, had sufficient recall to be reliable, or fabricated the account. It was the province of the fact finder to determine whether Administratrix's account of what her daughter told P.A. Anonich was credible.

While admittedly P.A. Anonich and the other healthcare providers had no independent memories of Trina or her hospital visit, they testified from the medical records they generated contemporaneously with treatment. Technically, Administratrix's proposed testimony is on the same footing as the contents of the medical records. All of the statements are hearsay, admissible due to exceptions to the hearsay rule, and offered by the respective parties to support their claims or defenses.

In precluding Administratrix from testifying as to what Trina said in her presence to P.A. Anonich, the trial court focused on the possible motive of the person relaying the statement in court to fabricate, not that of the declarant.[8]

_____

[8] Contrary to the trial court's representation, it did not have a "first-hand view of the testimony and witnesses" when it ruled that such testimony was inadmissible hearsay. The issue arose via a motion *in limine* prior to trial, and

This was error. The two elements of the hearsay exception for medical treatment were met herein. There is no authority or rational basis for limiting the applicability of the hearsay exception for statements made for purposes of health care to instances where the statements are corroborated or offered by healthcare providers. Non-healthcare provider third-parties who are present when the statements are uttered are capable of reporting those statements in court, and are equally subject to cross-examination. The trial court abused its discretion in refusing to permit Administratrix to offer the proffered testimony.

The only question remaining is whether the trial court's ruling constituted reversible error. In order to be reversible error, "an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." **Phillips**, **supra** at 916 n.7 (citation omitted).

Defendants contend that there was no prejudice because the jury determined that Trina did not die from a PE caused by an undiagnosed DVT. The record, however, contains no such finding by the jury. The jury concluded that P.A. Anonich and Dr. McHugh were not negligent for failing to diagnose a DVT on January 2, 2013, **not** that Decedent did not die from a PE related to an earlier DVT. In concluding that Dr. Gibbons, Dr. Alexander, and Rising Sun

the decision to preclude such testimony was based on excerpts from Administratrix's deposition transcript, and the briefs and argument of the parties.

- 22 -

were negligent, and that their negligence caused or increased the risk of harm resulting in Trina's death, the jury's verdict was consistent with a finding that she died either from a PE or arrhythmia.[9]

Administratrix's proffered testimony was highly relevant to the issue of what P.A. Anonich knew when she allegedly failed to diagnose a DVT. In addition, Administratrix's deposition testimony that Decedent told P.A. Anonich in the emergency room at Mercy about her family history of DVT and her episode of syncope factored heavily into the opinions of her experts. When the proffered testimony was excluded, the rippling effect was that experts could not reference this critical evidence in support of their opinions. Daniel Michael Mayer, M.D., opined in his December 5, 2016 report, that "discharge was not a reasonable course of action considering the complaint of syncope, the prior family history of blood clots in the brother, and the prior history of trauma and complaints of leg swelling." Mayer Report, 12/5/16, at 3. After Administratrix's proffered testimony, the expert was precluded from mentioning the family history of DVT and episode of syncope. *See* N.T., 3/27/19, at 70-71.

In short, absent factual evidence that Decedent told the nurses and P.A. Anonich of her family history of DVT and the episode of syncope earlier that

---

[9] There was no allegation in the pleadings or evidence adduced at trial that Dr. Gibbons, Dr. Alexander, and Rising Sun were negligent for failing to diagnose and treat arrhythmia or related conditions.

day, there was less evidence that health care providers should have suspected DVT, and therefore, should have conducted a D-dimer blood test, or performed a Doppler ultrasound to rule it out.[10] For these reasons, we find that the trial court's error in excluding such testimony was highly prejudicial to Administratrix, and hence, a new trial is required.

Having concluded that a new trial is necessary, we need not reach Administratrix's remaining issues except to the extent that they are likely to recur or are relevant to the disposition of the cross-appeal. Upon retrial, Dr. Callery's autopsy findings again will be critical to Administratrix's case, and it

_____

[10] Decedent's brother, John Lewis Adams, a chiropractor, was not permitted to testify that he had suffered DVT and PE. The trial court ruled that his testimony was inadmissible for lack of foundation and relevance. Defendants McHugh and Anonich argue on appeal that evidence of Dr. Adams' previous treatment for DVT was properly found to be irrelevant as it had nothing to do with duty, breach, or the harm at issue. **See** Brief of McHugh and Anonich at 25.

Dr. Adams's deposition is not contained in the certified record and there was no proffer on the record or foundation laid as to the substance of his testimony. Assuming that a proper foundation can be laid establishing that Dr. Adams's history of DVT and PE placed Decedent at a higher risk for DVT, such testimony may be indeed be relevant to the issue whether Decedent died of a PE, an issue that was contested at trial. Dr. Kamerow, Administratrix's expert pathologist, based his opinion as to cause of death in part on the fact that Decedent had multiple risk factors for PE, one of which was a brother with a history of multiple pulmonary emboli and DVT. **See** Report of Dr. Kamerow, 5/1/18, at 8 (Exhibit E to Memorandum of Law in Support of Motion in Limine under **Frye** [**v. United States**, 293 F. 1013 (D.C. Cir. 1923)] to Preclude the Testimony of Plaintiff's Experts, Richard T. Callery, M.D. and Harry N. Kamerow, M.D. at the Time of Trial). When the court ruled inadmissible both the testimony of Administratrix and Decedent's brother, Dr. Kamerow was precluded from relying upon that evidence.

is likely that he will not testify. Administratrix alleges on appeal that it was error to permit impeachment of Dr. Callery, a non-testifying witness, with documentary evidence of convictions pursuant to Pa.R.E. 609(a). This merits some discussion.

The record reveals that Dr. Callery was retained by Administratrix within a week of her daughter's death to perform a private autopsy to determine the cause of Decedent's sudden death. Dr. Callery conducted the autopsy without the benefit of medical records or Dr. Lieberman's findings. During the course of the autopsy, he prepared a document containing his findings, which the trial court designated as a "summary." He also rendered opinions in a document the court referred to as his "report." In the summary of his findings, Dr. Callery reported that he found multiple emboli in the Decedent's pulmonary artery in a location that had not been previously dissected. He photographed the emboli after determining that they were present prior to death. Dr. Callery measured the circumference of Decedent's legs and determined that her right leg was one inch larger in the thigh and calf than her other leg. He dissected the right leg, which Dr. Lieberman had not done, and located residue from a blood clot. Based on the foregoing, Dr. Callery concluded that Decedent died due to multiple pulmonary emboli that broke away from a DVT located in her right leg. Both the summary and report were made available to the defense years prior to trial.

More than a year after the autopsy, Dr. Callery was criminally charged with two counts of misuse of his office. As the trial court noted, the allegation was that Dr. Callery performed private autopsies as a side business during working hours and, that in doing so, he used State lab equipment, storage space, and personnel.[11] *See* Trial Court Opinion, 6/28/19, at 8 n.10. During the course of the investigation, law enforcement entered Dr. Callery's home and seized files, slides, and photographs pertaining to the private autopsies he had performed, including those related to the autopsy of Decedent, and retained them for a considerable period of time. Dr. Callery subsequently pled *nolo contendere* to the charges and agreed to the suspension of his medical license for two years and restitution in the amount of $100,000. The items seized were eventually returned to him, but in a condition that made it impossible for him to determine which slides, specimens, and photographs pertained to which autopsies.

Prior to trial, the various Defendants filed motions *in limine* to preclude Dr. Callery from testifying at trial. They argued that he was not qualified as a medical expert under the MCare Act, that his opinion was not based on data in the record in violation of **Frye v. United States**, 293 F. 1013 (D.C. Cir. 1923) (adopted in Pennsylvania in **Commonwealth v. Topa**, 369 A.2d 1277 (Pa.

---

[11] Dr. Callery maintained that his performance of private autopsies was known and sanctioned, and that the investigation and subsequent charges were politically motivated.

1977)), and that his testimony should be precluded as a sanction for spoliation. Administratrix opposed those motions, and filed a motion *in limine* to preclude any evidence of or reference to Dr. Callery's convictions. She argued that the convictions were irrelevant as they did not make any fact of consequence in this action more or less probable and occurred after Dr. Callery's conduct relative to the facts herein. Administratrix alleged further that the probative value of the convictions was outweighed by the danger of unfair prejudice as the jury might be inclined to decide the case based on an improper basis. **See** Pa.R.E. 402. Finally, she maintained that the two counts of misconduct did not involve dishonesty or false statement.

The trial court ruled that Dr. Callery could testify, but also ruled that he could be questioned about his misconduct and the circumstances surrounding the missing slides and photographs. **See** N.T., 3/25/19, at 141. Counsel for Administratrix subsequently represented that they might not call Dr. Callery as a witness.[12] The court ruled that, in that event, Dr. Callery's report would

_____

[12] On the record before us, it is far from clear that defendants established that Dr. Callery was a witness available solely to Administratrix. **See Hawkey v. Peirsel**, 869 A.2d 983, 987 (Pa.Super. 2005). Nor can we conclude that the seizure and subsequent unavailability of Dr. Callery's slides and photographs constituted spoliation on the part of Administratrix. Upon remand, if Dr. Callery does not testify, and there is a renewed request for adverse inference instructions regarding Administratrix's failure to call Dr. Callery as a witness or adequately explain the absence of his slides and photographs, we encourage the trial court to re-examine these issues in the context of the newly-developed record.

be excluded from evidence, but his summary could be relied upon by Dr. Kamerow because it contained only "medical/anatomical findings."[13] Trial Court Opinion, 6/28/19, at 9; *see also* N.T., 3/25/19, at 145.

Dr. Callery did not testify at trial. Despite the fact that Dr. Callery was not a witness, the trial court permitted the defense to place into evidence official documents evidencing his convictions. In support of its ruling, the trial court relied upon authorities authorizing the use of *crimen falsi* convictions to attack a **witness** and impeach his credibility. *See* Pa.R.E. 609(a) ("For the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime, whether by verdict or by plea of guilty or nolo contendere must be admitted if it involved dishonesty or false statement."). The court reasoned that the criminal docket and the Department of Justice sentencing memorandum were "relevant for impeaching Dr. Callery's work as unreliable, and by extension, impeaching as unreliable the expert report that relied upon it (specifically Dr. Kamerow's)." Trial Court Opinion, at 16. They were also "relevant for . . . explaining the absence of the autopsy records" and "did not require further foundation." *Id*.

---

[13] Technically speaking, Dr. Kamerow should have been permitted to base his opinion on Dr. Callery's opinion contained in his report, even though the report was not admitted into evidence. It is well-settled that a medical expert may express an opinion which is based on material not in evidence, including other expert opinions, where such material is of a type customarily relied on by an expert in his or her profession and he is not acting as a mere conduit of the opinion. *See, e.g., Collins v. Cooper*, 746 A.2d 615, 618 (Pa.Super. 2000) (citing *Primavera v. Celotex Corp.*, 608 A.2d 515 (Pa.Super. 1992)).

We find first that Dr. Callery's convictions, and the documents evidencing the convictions, were irrelevant to the reliability of his pathology findings. The subsequent convictions did not in any way diminish Dr. Callery's medical expertise or make his pathological findings less reliable. Furthermore, to the extent that the convictions were relevant to explain the unavailability of Dr. Callery's photographs and slides, the trial court was required to weigh relevancy against the prejudicial effect of admitting such evidence.[14] Arguably, the unavailability of such materials could have been explained to the jury without the undue prejudice generated by evidence of Dr. Callery's convictions.

Most notably, however, the trial court erred in relying upon Rule 609(a) for the admission of the sentencing memorandum and criminal docket for impeachment purposes. That rule authorizes the use of *crimen falsi* convictions to impeach a **testifying witness**. Since Dr. Callery did not testify, Rule 609(a) was inapplicable and did not justify the admission of those documents evidencing his criminal convictions for impeachment purposes. Assuming Dr. Callery does not testify at the new trial following remand, evidence of his convictions shall not be admitted.

_____

[14] The trial court characterized the references to Dr. Callery's legal woes as "[m]inimal narrative" that it deemed "less confusing and distracting to the jury." Trial Court Opinion, 6/28/19, at 15. We do not agree. The charges were the subject of cross-examination of Dr. Kamerow, and referenced during the direct examination of Dr. Kenyon when exploring the missing photographs and slides.

Having concluded that a new trial is necessary, and having addressed an issue likely to recur, we turn now to consideration of the scope of the new trial. Administratrix argues in her original brief that a new trial is necessary because, *inter alia*, the trial court erred in failing to grant a nonsuit and/or a directed verdict in favor of both Dr. Gibbons and Dr. Alexander because no expert testimony was offered that either breached the standard of care. The trial court granted JNOV in favor of Dr. Gibbons based on that reasoning, but did not explain why the same rationale was not equally applicable to Dr. Alexander.

P.A. Anonich and Dr. McHugh have filed a cross appeal in which they argue that they should not be required to take part in a new trial, if one is ordered, because the jury absolved them of negligence and there was no reversible error. **See** Brief of McHugh and Anonich at 66. They suggest that remand might be required to "re-assess liability among Dr. Alexander and Rising Sun Medical Center, given the former's protection by the Bankruptcy Court's order, and the judgment n.o.v. entered in favor of Dr. Gibbons." **Id**. In the event they must participate in a new trial, they argue that Dr. Gibbons should also be required to participate despite the fact that the trial court entered JNOV in his favor.

After a thorough review of the record, we find no expert testimony that either Dr. Gibbons or Dr. Alexander breached the standard of care, let alone

caused or contributed to Decedent's death from PE.[15] We agree with Administratrix that nonsuit or a directed verdict should have been granted in favor of these defendants prior to submission of the case to the jury.

Nonetheless, "[t]he grant of a new trial wipes the slate clean of the former trial." *Banohashim v. R.S. Enters., LLC*, 77 A.3d 14, 27 n.6 (Pa.Super. 2013) (quoting *Commonwealth v. Oakes*, 392 A.2d 1324, 1326 (Pa. 1978)) (holding that the grant of a new trial leaves the case as if no previous trial was held and unfettered by the rulings made at the first trial). Hence, we agree with Dr. McHugh and P.A. Anonich that Dr. Gibbons's personal representative must be substituted in the case and included in the new trial.[16] The essence of Administratrix's complaint is that it was the failure of some or all of the defendants, including Dr. Gibbons, to diagnose Decedent's DVT that resulted in her untimely death from multiple PE. The cross-claim filed by Dr. McHugh and P.A. Anonich alleged that if there was any negligent failure to diagnose a DVT resulting in Decedent's death, it was the negligence of Dr. Gibbons and Dr. Alexander, as they were responsible for her medical

---

[15] Among Administratrix's listed expert witnesses was Dr. Ronald Banner, an internal medicine physician who prepared an expert report addressing claims against Dr. Alexander, Dr. Gibbons and Rising Sun Medical Center. Administratrix elected not to call the expert at trial.

[16] The docket indicates that a suggestion of death was filed on behalf of Dr. Wayne Gibbons on July 24, 2019.

care during the two-week period after she was seen in the emergency room of Mercy. Hence, the grant of JNOV in favor of Dr. Gibbons must be reversed.

The case is further complicated by the fact that the Bankruptcy Court issued an order well in advance of trial to the effect that Dr. Alexander was to be dismissed from the lawsuit, but the trial court did not heed it. Administratrix references orders issued by the Bankruptcy Court post-judgment, which are not part of the certified record in this case and not properly before us.[17] The certified record does confirm, however, that Dr. Alexander was discharged in bankruptcy, and that the bankruptcy court issued an order granting an injunction precluding his participation as a party in these proceedings.

Dr. Alexander did not attend trial, but he filed a motion requesting his dismissal from the case pursuant to 11 U.S.C. §524(a)(1)-(2), and his bankruptcy discharge. The trial court denied the motion. *See* N.T., 4/3/19 a.m., at 102-03. The trial court did not explain its reasoning in refusing to dismiss Dr. Alexander from the case, nor did it suggest that his participation was required for purposes of apportionment only. A verdict was entered

---

[17] Administratrix argues that on November 15, 2019, the Bankruptcy Court granted Dr. Alexander's motion to quash the judgment because the trial court had refused to dismiss him from the case as ordered.

against Dr. Alexander, and subsequently, a judgment was entered on that verdict.[18]

In determining the scope of the new trial, the relationship between the Dr. Alexander's bankruptcy and applicable Pennsylvania tort law must be examined. Our Supreme Court held recently in **Roverano v. John Crane, Inc.**, 226 A.3d 526, 527 (Pa. 2020), that Title 11 U.S.C. § 524(a)(1)-(2) provides that a bankruptcy discharge "(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged . . . whether or not discharge of such debt is waived" and "(2) operates as an injunction against the commencement or continuation of an action . . . to recover or offset any such debt as a personal liability of the debtor whether or not discharge of such debt is waived." **See** 11 U.S.C. §524(a)(1)-(2). Thus, it would appear that any judgment against Dr. Alexander is void.

At the same time, this case is governed by the Fair Share Act ("the Act"), 42 Pa.C.S. § 7102(a), which abolished joint and several liability in most negligence cases. The Act requires that damages be apportioned in negligence cases based upon the relative causal negligence of the parties. **See** § 7102(a.1)(1) (providing for apportionment of negligence among multiple

---

[18] The trial court erred in disregarding the order of the bankruptcy court to dismiss Dr. Alexander, and then permitting a verdict to be entered against him, which was subsequently reduced to judgment.

defendants). In ***Roverano***, a strict liability case involving asbestos defendants, some of whom were bankrupt, the Supreme Court concluded that "upon appropriate requests and proofs, bankruptcy trusts that are either joined as third-party defendants or that have entered into a release with the plaintiff may be included on the verdict sheet for purposes of liability only." ***Id***. at 528. The Court determined that damages would be assessed on a *per capita* basis.

The ***Roverano*** Court's reasoning is helpful herein in reconciling the effect of the bankruptcy with applicable Pennsylvania tort law. Although the bankruptcy court required dismissal of Dr. Alexander from the lawsuit, the Act would seemingly require that he be included on the verdict slip for purposes of apportionment "upon appropriate requests and proofs."

Since we are vacating the judgment, setting aside the verdict, and remanding for a new trial, error in entering the verdict and judgment against Dr. Alexander is remedied. Upon remand, the trial court shall dismiss Dr. Alexander from the lawsuit in accordance with the bankruptcy court's order. However, in accordance with the Act, if the evidence at the new trial would be legally sufficient to support liability against Dr. Alexander, his name may appear on the verdict slip for purposes of apportioning negligence only.

In sum, we hold that the trial court's decision to preclude Administratrix from offering evidence of the Decedent's statements to P.A. Anonich concerning her symptoms and family history of DVT was reversible error, and

warrants a new trial. We have further addressed issues likely to reoccur upon remand. The remainder of Administratrix's issues are moot.

Judgment vacated and verdict set aside. Judgment NOV as to Dr. Gibbons reversed. Case remanded for new trial. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/29/20